## CLARKSON v. STEVENS.

1. Where, by a contract for the construction of a ship, the builder is to furnish the requisite labor and materials, and to receive therefor a sum payable in instalments as the work progresses, this court will not enforce any arbitrary rule of construction in determining the question whether the title remains in the builder until the ship is delivered or ready for delivery, or whether the property in so much of her as on the payment of any instalment is completed passes to the other party; but it will carry into effect the intent of the parties, to be gathered from the terms of the contract and the circumstances attending the transaction.

2. Being thereunto authorized, the Secretary of the Navy entered into a contract with S., whereby the latter covenanted to construct a shot-and-shell-proof war-steamer for harbor defence. The Secretary was to appoint an agent to receive and, on account of the Navy Department, receipt for all materials delivered at S.'s establishment for the construction of the steamer, — the materials, when receipted for, to become the property of the United States, and to be marked "U. S." The agent's certificate to S.'s accounts for materials and labor was the evidence on which payments were to be made to the latter. S. executed a mortgage to the United States to secure his faithful performance of the contract, conferring upon the mortgagee, in case of his failure to fulfil it, power to enter upon his establishment and sell the steamer. When the steamer should be fully completed by S. and accepted by the United States, the balance of the purchase price was then to be paid and the mortgage surrendered. The period within which the vessel was to be completed was from time to time extended. S. died, and the vessel was never finished. Held, 1. That the title to the unfinished vessel remained in S., and that no property therein vested in the United States. 2. That by the resolution of Congress, releasing and conveying to his heirs-at-law "all the right, title, and interest of the United States in and to" the vessel, nothing passed to them.

ERROR to the Court of Chancery of the State of New Jersey.

The facts are stated in the opinion of the court.

Mr. Walter L. Clarkson and Mr. Frederick W. Stevens for the plaintiffs in error.

Mr. Leon Abbett and Mr. John P. Stockton, Attorney-General of New Jersey, contra.

MR. JUSTICE MATTHEWS delivered the opinion of the court.

The controversy in this case arises between the plaintiffs in error, who are, with others, heirs-at-law of Robert L. Stevens,

deceased, and the State of New Jersey, and involves the title to an uncompleted ship-of-war, known as the "Stevens Battery."

The claim of the plaintiffs in error is founded on a resolution of Congress approved July 17, 1862, 12 Stat. 628, as follows: —

"*A resolution releasing to the heirs-at-law of Robert L. Stevens, deceased, all the right, title, and interest of the United States in and to ' Stevens' Battery.*'

"*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled*, That all the right, title, and interest of the United States in and to 'Stevens' Battery' be, and the same hereby are, released and conveyed to the heirs-at-law of the said Robert L. Stevens, or their legal representatives."

Robert L. Stevens died in 1856, having his domicile in New Jersey, and by his will constituted his brother, Edwin A. Stevens, who was one of his heirs-at-law, and whom he appointed one of his executors, his sole residuary devisee and legatee.

Conceiving himself to be the owner of the unfinished vessel, of which he had been in possession since the death of his brother, and claiming as his residuary legatee, Edwin A. Stevens, who died Aug. 7, 1868, directed, by his will, his executors to complete it on his general plan, at a cost not exceeding $1,000,000, and then to offer it to the State of New Jersey as a present. The executors, after having expended $919,915.49 upon the vessel, found that they could not finish it for the amount of money to which they were limited, and discontinued the work. In the mean time the State of New Jersey had accepted the bequest, and the consent of Congress thereto was given in the following resolution, approved July 1, 1870 : —

"*A resolution giving the consent of Congress to the reception of a certain bequest by the State of New Jersey under the will of the late Edwin A. Stevens.*

" Whereas Edwin A. Stevens, who was in his lifetime the owner of the ship known as the 'Stevens Battery,' originally commenced under contract for the United States government, and upon the building of which large sums of money were spent by his brother and himself, did, by his last will and testament (the United States having previously relinquished all claims to said ship), leave the

same to be finished by his executors, at an expense not exceeding the sum of one million of dollars, and when finished to be offered to the State of New Jersey as a present, to be by her received and disposed of as the said State shall deem proper; and

" Whereas doubts have been suggested as to the right of the said State to accept the said bequest without the consent of Congress, under the prohibition of the tenth section of the first article of the Constitution of the United States: Therefore,

" *Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That the consent of Congress is hereby given that the State of New Jersey shall receive and dispose of the said ship according to the terms and conditions of said bequest."

A bill in equity was filed in the Chancery Court of New Jersey, by the executors of Edwin A. Stevens, asking for a construction of the will, in certain particulars, including the questions arising upon this bequest to the State. The attorney-general appeared on behalf of the State, and filed an information, by way of cross-bill, to which the heirs-at-law of Robert L. Stevens were made parties, as claiming an adverse title. A final decree was made, establishing the title of the State, which was affirmed on appeal by the Court of Errors and Appeals. To reverse that decree the present writ of error was brought, the question presented being one which, as it arises under a law of the United States, and the decision thereon of the State court being in denial of the title claimed under the authority thereof, falls within the jurisdiction of this court.

To determine the proper construction and legal effect of the resolution of Congress of July 17, 1862, it becomes necessary to trace from its origin the history of the " Stevens Battery."

By the act of Congress of April 14, 1842, c. 22, " authorizing the construction of a war-steamer for harbor defence," it is enacted " that the Secretary of the Navy be and he is hereby authorized to enter into contract with Robert L. Stevens for the construction of a war-steamer, shot and shell proof, to be built principally of iron, upon the plan of the said Stevens: *Provided,* the whole cost, including the hull, armament, engines, boiler, and equipment, in all respects complete for service, shall not exceed the average cost of the steamers ' Missouri' and ' Mis-

sissippi,' " and $250,000 was thereby appropriated towards carrying the law into effect.

In pursuance of this law, the Secretary of the Navy entered, Feb. 10, 1843, into a contract with Robert L. Stevens for the construction of a war-steamer for harbor defence, which recited his proposal, describing the vessel, and containing certain specifications as to its construction, with a covenant on his part that he would faithfully build and construct the steamer conformably to the plan submitted, and complete the same within two years, provided Congress should make the further appropriations necessary for the purpose within a reasonable period.

According to the plan proposed the war-steamer was to be shot and shell proof against the artillery then in use on board vessels-of-war, viz. from 18-pounders to 64-pounders; to be propelled by submerged machinery, called Stevens's circular shells; to have greater speed than any of our steam vessels-of-war then built; the whole engine to be out of the way of shot from any vessel of an enemy; and with other specifications as to the character of the material and the dimensions and relations of the parts, which are important to be noticed only so far as to show that the proposed vessel was to be constructed upon a plan original and novel, and with the expectation of results not previously obtained in any naval construction.

The Secretary of the Navy and Stevens entered, Nov. 14, 1844, into an explanatory contract, which recited that the stipulations of the former had been found to be too loose and indefinite as to the details of its execution, and that the parties, considering themselves bound by so much thereof as related to the dimensions, power, ability to resist shot and shell, and other qualities and arrangements of the vessel, and the amount to be paid therefor, entered into further stipulations modifying and explaining the same. The time for the completion and delivery of the vessel was extended two years from the date of the new contract. Many additional specifications as to the details of construction were inserted. It was agreed that, if the cost of making any models or patterns used in the construction should be included in bills paid by the United States in the course of the work or at its completion, they should become the property of the United States.

It was also agreed that the Secretary of the Navy should appoint some person, whom Stevens should admit within his establishment for building said vessel, whose duty it should be to receive and receipt for, on account of the Navy Department, all materials delivered therein for constructing said steamer; which materials, when so received and receipted for, should be distinctly marked with the letters " U. S.," and should become the property of and belong to the United States; and it should be his further duty to certify all accounts, presented and certified by Stevens, for materials and labor, which should form the evidence on which payments should be made; but the authority of such inspecting officer, it was understood, should not extend to a right to judge of the quality or fitness of the materials or workmanship, but merely as to the cost thereof; "it being understood," the contract proceeds, "that the quality and fitness thereof, with other matters concerning the performance of the contract, are to be inspected and determined in the manner hereinafter provided for."·

It was thereupon further stipulated, that before the final payment for the said war-steamer should be made a certificate should be rendered to the Navy Department, that, in her construction, armament, and equipment, all the provisions of the contract had been fully performed by Stevens, which certificate should be given and signed by persons appointed to examine the vessel, one by Stevens, one by the Secretary of the Navy, and, in case of disagreement, a third by the other two, the decision of the majority to be conclusive. It was also agreed that Stevens, in lieu of other security for the faithful performance of the contract on his part, should make to the United States a mortgage, which should be a first lien on all the land, docks, wharves, slips, and all their appurtenances belonging to and embraced within the establishment at Hoboken, New Jersey, at which the war-steamer was to be constructed, with ample power to enter upon and sell the same in case of failure on his part to fulfil the contract, or so much thereof as should be necessary to complete any deficiencies on his part.

The Secretary of the Navy agreed to pay, as the price of the said war-steamer, when fully completed and delivered at the navy-yard at Brooklyn, in conformity with the contract,

the sum of $586,717.84, the supposed mean cost of the steamers "Missouri" and "Mississippi," or any additional sum that might afterwards be ascertained as properly included in that cost, to be indorsed on the contract "as the price which is to be paid for the said war-steamer when fully completed, delivered, and accepted."

Payments were to be made, from time to time, upon bills certified by Stevens and the agent of the United States, for not less than $5,000 each, and approved by the Navy Department, until the sum of $500,000 should have been paid; at which time, it was stipulated, that an examination should be had of the war-steamer, by persons to be appointed, as before agreed, for final examination, and if a majority of them should certify their opinion that the vessel could be fully completed according to contract for the remaining balance which might then be due, then payments of further bills in full should continue, not exceeding the full amount of the whole agreed price; but otherwise the examiners were required to certify the amount which, in their opinion, would be required to complete the steamer, when the Secretary of the Navy was authorized to withhold from future payments such deductions as might be necessary to meet the probable excess of cost. It was further provided, that when Stevens should have fully completed the said war-steamer, and she should have been duly delivered to and received by the agent of the United States, according to the terms of the contract, the full amount of the price remaining unpaid and to become due when she should be fully completed and accepted was required to be paid and the mortgage security cancelled and returned.

In pursuance of his contract to that effect, Stevens executed and delivered a mortgage on the premises therein described, being the basin, dock, shops, &c., wherein the war-steamer was to be constructed, conditioned to be void, in case he fully performed his contract in relation thereto, with a power of entry and sale, on the part of the mortgagee, in case default should be made in the completion and delivery of the said war-steamer at the expiration of four years from that date, according to the conditions and stipulations of the contract, and out of the proceeds of such sale to retain any dues that might have accrued

by reason of the failure to perform the contract; or so much thereof as should be necessary to complete any deficiencies on the part of the said Stevens.

The time for the performance of the contract was by a subsequent agreement extended for four years from Sept. 9, 1848.

From Jan. 5, 1845, to Dec. 14, 1855, there was paid out by the Navy Department on account of the vessel $500,000.

Robert L. Stevens had, in addition, expended in its construction, of his own means, $113,579.

The act of Aug. 16, 1856, c. 123, contains an appropriation "for Stevens war-steamer, eighty-six thousand, seven hundred and seventeen dollars and eighty-five cents," being the remainder of the contract price; but no portion of this was ever paid.

In the mean time, Edwin A. Stevens took possession of the work upon the death of his brother, as executor and residuary legatee, and expended thereon, prior to Sept. 5, 1857, of his own money, the sum of $89,185.37.

Nothing further appears to have been done until the passage of the act of April 17, 1862, c. 57, making an additional appropriation for the naval service for the year ending June 30, 1862. The second section is as follows : —

"*And be it further enacted*, That the sum of $783,294, being the amount necessary to be provided, as estimated by a board appointed for that purpose, to pay for and finish the 'Stevens Battery' now partially constructed at Hoboken, New Jersey, be and the same is hereby appropriated out of any money not otherwise appropriated for the immediate construction of said battery: *Provided*, that in the contract for the completion of said vessel it shall be stipulated that no part of the money claimed by Edwin A. Stevens to have been heretofore expended by him upon said vessel shall be refunded until the amount of said claim shall be established to the satisfaction of the Secretary of the Navy, and the payment of the said sum shall be contingent upon the success of said vessel as an ironclad, sea-going war-steamer, to be determined by the President, and such contract shall stipulate the time within which the vessel shall be completed: *Provided, nevertheless*, that said money shall not be expended unless the Secretary of the Navy is of opinion that the same will secure to the public service an efficient steam battery."

The board, whose estimate is adopted in this act, was one appointed by the Secretary of the Navy, under the authority of a joint resolution of Congress, approved July 24, 1861, whose report was communicated to the House of Representatives in a letter of the Secretary of the Navy to the Speaker, dated Jan. 2, 1862.   Ex. Doc. No. 23, H. R., 37th Congress, 2d Sess. Upon the question of the expediency of completing the vessel, the board specify six important particulars, as among " the many novel characteristics which she would possess," in which she differed from ordinary war-vessels, and conclude by saying : " We cannot recommend the expenditure of important sums of money upon projects of more than doubtful success when put into practical execution; and therefore we do not deem it expedient to complete this vessel upon the plan proposed."   The report had previously stated " that the original projector of the vessel was the late Robert L. Stevens, Esq., deceased, and that his brother, Edwin A. Stevens, Esq., who now proposes to complete it, has materially changed the plans from what appears to have been originally intended."

No part of the sum appropriated by the act of April 17, 1862, was applied to the purpose of completing the battery. The Secretary of the Navy declined to do so, in the exercise of the discretion confided to him in the last clause of the section, for reasons set forth in his letter to the Speaker of the House of Representatives, dated May 27, 1862, in which he states that he had taken the opinion of a commission of experts, who had reported that " the vessel, if completed on the plans of Mr. Stevens, will not make an efficient steam battery," and, therefore, that he did not feel authorized to make the expenditure unless Congress should so direct.

Congress thereupon passed the joint resolution, approved July 17, 1862, on which the plaintiffs in error found their claim.

Nothing appears to have been done towards resuming work on the vessel from the date of the last previous expenditure in 1857, until the death of Edwin A. Stevens, on Aug. 7, 1868, during which time it remained in his possesion and control. His will contained the following provision : " I empower my executors to apply not exceeding the sum of one million dollars

to finish, on my general plans, as near as may be, in the discretion of my said executors, the battery known as the 'Stevens Battery,' and for the accomplishment of the said object I give to them the use of the dock and yards and basin heretofore appropriated to the said battery, and all the material provided for said battery. When said battery shall be finished, I direct my executors to offer the same to the State of New Jersey as a present, to be disposed of as the said State shall deem proper; and if not accepted by the said State, I direct my executors to sell the same, and the proceeds thereof shall fall into the residue of my estate."

In execution of this authority the executors, prior to Feb. 27, 1873, expended $919,915.49, of which $27,309.79 was received from the sale of old material.

The legislature of New Jersey, on March 21, 1871, had authorized the appointment of commissioners with power to sell the battery, and, in pursuance of that authority, the vessel, never having been finished, was sold for the sum of $75,000.

The contention of the plaintiffs in error is that the title to the unfinished vessel passed, as the work progressed, to the United States, and became vested, together with the right to enforce the contract for its completion, and the security of the mortgage, as against the estate of Robert L. Stevens, in his heirs-at-law, by force of the joint resolution of July 17, 1862.

In support of the proposition that by the building contract the title to the unfinished ship vested, as the work progressed, in the United States, counsel rely upon the rule of construction announced by Lord Tenterden in *Woods* v. *Russell*, 5 Barn. & Ald. 942, and followed by the English cases of *Clarke* v. *Spence*, 4 Ad. & E. 448; *Carruthers* v. *Paine*, 5 Bing. 270; *Laidler* v. *Burlinson*, 2 Mee. & W. 602; *Wood* v. *Bell*, 5 El. & Bl. 772, affirmed in the Exchequer Chamber, 6 id. 355; *McBain* v. *Wallace*, 6 App. Cas. 588; and by the American cases of *Moody* v. *Brown*, 34 Me. 107; *Butterworth* v. *McKinly*, 11 Humph. (Tenn.) 206; *Sandford* v. *Wiggins Ferry Co.*, 27 Ind. 522; *Scudder* v. *Calais Steamboat Co.*, 1 Cliff. 370.

This conclusion was assented to in the present case by the Chancellor, who proceeded to a final decree, however, against the plaintiffs in error, on the ground that the title of the

United States passed by the resolution of July 17, 1862, not to
the heirs-at-law of Robert L. Stevens for their own benefit, but
to or for the benefit of Edwin A. Stevens, the residuary legatee.
The Court of Errors and Appeals, while affirming his decree,
took a different view, and decided that the title of the ship
never vested in the United States as owner; following its own
previous decision in *Elliott* v. *Edwards*, 35 N. J. L. 265; s. c.
36 id. 449; the New York case of *Andrews* v. *Durant*, 11 N. Y.
35; and supported by the decision in *Williams* v. *Jackman*,
16 Gray (Mass.), 514, in which the rule is stated by Bigelow,
C. J., as follows: " Under a contract for supplying labor and
materials and making a chattel, no property passes to the
vendee till the chattel is completed and delivered or ready to
be delivered. This is a general rule of law. It must prevail
in all cases, unless a contrary intent is expressed or clearly im-
plied from the terms of the contract."

The rule first introduced in *Woods* v. *Russell*, 5 Barn. &
Ald. 942, as interpreted by the English courts, according to
*Clarke* v. *Spence*, 4 Ad. & E. 448, is " founded on the notion
that provision for the payment, regulated by particular stages
of the work, is made in the contract with a view to give the
purchaser the security of certain portions of the work for the
money he is to pay, and is equivalent to an express provision
that, on payment of the first instalment, the general property
in so much of the vessel as is then constructed shall vest in the
purchaser." This *dictum* from *Woods* v. *Russell*, according to
Benjamin on Sales, 246, 2d ed., was deliberately adopted as
a rule of construction by which, in similar ship-building con-
tracts, the parties are held to have, by implication, evinced an
intention that the property shall pass, notwithstanding the
general rule to the contrary, and adds: " The law thus estab-
lished has remained unshaken to the present time."

Nevertheless, in *Wood* v. *Bell*, 5 El. & Bl. 772, Lord Camp-
bell, C. J., said: " When a man contracts with another to
make any article for him for a given price, the general rule is,
in the absence of all circumstances from which a contrary con-
clusion may be inferred, that no property passes in the chattel
until it be completed and ready for delivery; on the other
hand, where a bargain is made for the purchase of an existing

ascertained chattel, the general rule, in the same absence of opposing circumstances, is that the property passes immediately to the vendee; that is, that there is at once a complete bargain and sale. But these general rules are both and equally founded on the presumed intention of the parties. If, in the first, there are attendant circumstances from which the intention may be inferred that the property shall pass in the incomplete and growing chattel as the manufacture of it proceeds, or even in ascertained materials from which it is to be carried to perfection, that intention will be effectuated; and equally, in the latter, if it appear that the parties intended to postpone the transfer of the property till the payment of the price or the performance of any other condition, such intention will be upheld in the courts of law." "This principle," he added, "we believe to be well settled;" and referring to the cases of *Woods* v. *Russell*, *Clarke* v. *Spence*, *Laidler* v. *Burlinson*, and others, cited in argument, he remarked, that "previous decisions, therefore, are mainly useful as serving to guide our judgment in estimating the weight of circumstances as evidence of intention;" and concluded by saying: "Still it must be remembered, after all, that what we have to determine is a question of fact; namely, what, upon a careful consideration of all the circumstances, we believe to have been the contract into which the parties have entered."

It is, perhaps, worthy of remark, that this passage from the judgment of Lord Campbell has, by the editors of Abbott on Merchant Ships and Seamen, been incorporated into the text of that treatise.

The courts of this country have not adopted any arbitrary rule of construction as controlling such agreements, but consider the question of intent, open in every case, to be determined upon the terms of the contract, and the circumstances attending the transaction. 1 Parsons, Shipping and Admiralty, 63. And such seems to us to be the true principle.

Accordingly, we are of opinion, that the fact that advances were made out of the purchase-money, according to the contract, for the cost of the work as it progressed, and that the government was authorized to require the presence of an agent to join in certifying to the accounts, are not conclusive evi-

dence of an intent that the property in the ship should vest in the United States prior to final delivery. Indeed, in reference to the latter circumstance, it is noticeable, as indicating a contrary intention, that the authority of the inspecting officer was expressly limited, so that it should not extend to a right to judge of the quality and fitness of the materials or workmanship, such matters and all others concerning the performance of the contract being reserved for determination after the completion of the work, as a condition of acceptance and final payment.

Much stress is laid, in argument, upon that provision of the contract which required all materials received at the yard for use in constructing the steamer to be distinctly marked with the letters " U. S.," and declared that they should become the property of and belong to the United States. But it does not follow, because the materials provided for that use were declared to be the property of the United States, it was intended that they should remain so after becoming part of the structure. Such a precaution might well have been suggested, as a security against a diversion of the materials to any unauthorized use, or to preserve them to the United States, in case, by reason of the failure of the work or from any other cause, they should not be used in the vessel. Indeed, as is remarked by the learned judge who delivered the opinion of the Court of Errors and Appeals in this case, the express declaration that defined the property in the unused materials seems to exclude the implication sought to be raised as to the property in the unfinished ship ; for the inference is obvious, from the particularity of such a provision, that the larger interest would not be left to mere intendment.

There are two other provisions of the contract, which seem to us conclusive of the question, and, in a sense, adverse to the construction of the plaintiffs in error.

The first of these is, that which required Stevens, in lieu of other security for his faithful performance of the contract, to execute and deliver a mortgage on all the land, docks, wharves, slips, and all their appurtenances belonging to and embraced within the establishment at Hoboken, N. J., at which the war-steamer was to be constructed, with power to the

· United States to enter upon and ·sell the same in case of his failure to fulfil his part of the contract, or ôo much thereof as should be necessary to complete any deficiencies on his part.

The taking of this security, as an indemnity to the United States, assumes the anticipated possibility that the failure might be total, so that the vessel, when offered for delivery, might be altogether rejected. And it does not detract from the force of this conclusion, that the alternative provides for completing deficiencies, if they should prove to be remedial; for, in that case, the United States, at its option, might accept the vessel, thus becoming invested with the title, and make good its deficiencies out of this security.

The other feature ·of the contract, which corroborates this view, is that which provides that final payment for the steamer shall be made only upon the certificate of examiners, to be appointed for that purpose, that in her construction, armament, and equipment all the provisions of the contract have been fully performed and completed, which requires that the steamer shall be fully completed and delivered at the navy-yard at Brooklyn, and fixes the gross amount which is to be paid for it when fully completed, delivered, and accepted. The fact that advances are to be made in the mean time is expressly stated to be in consideration of the security to be given by Stevens for the faithful performance of his contract, and that compensation for his time and services must be wholly deferred until the final completing and delivery of the vessel.

It is thus apparent, as we think, from these stipulations that the vessel was in all respects to be at the risk of the builder until, upon its completion, the United States should accept it, upon final examination and certificate, as conforming in every particular with the requirements of the contract, and answering the description and warranty of an efficient steam battery for harbor defence, shot and shell proof.

And looking at the situation of the parties, and the objects they must have had in view, all doubt is removed as to their intention. Stevens was an ardent and sanguine inventor, who had convinced himself that his unique design of a naval structure was practicable and of great value, and that, if adopted, it would prove to be of immense public utility. He succeeded

also in persuading the government to make the experiment, and give him the opportunity of realizing his theories. But it was understood to be merely an experiment, and evidently, by the Navy Department, naturally conservative and inclined to adhere with some tenacity to its own traditions, regarded, at best, as of very doubtful success. The steamer, when built, was to constitute a part of the naval establishment of the United States. Can it be supposed that this was to take place except upon condition that, after completion and sufficient examination, it should be found fit for the service? This is the view, as it seems to us, which Congress, by its legislation, and the Navy Department, in all its dealings with the subject, constantly entertained and acted upon, and which both Robert L. Stevens and his brother, Edwin A. Stevens, did not hesitate to accept, the latter not shrinking from a further investment of $1,000,000 in an enterprise which he still cherished with confidence of ultimate success, after it had become to almost every one else a demonstrated failure, and after the government, for whom it was originally intended, had refused to it all further subsidies.

We find, therefore, that on July 17, 1862, the date of the joint resolution of Congress, under which the plaintiffs in error make their claim, the United States had no title to the " Stevens Battery ; " but that the property in it had continued in Robert L. Stevens until his death, and passed, by his will, to Edwin A. Stevens, as residuary legatee. It follows that it did not pass to the heirs-at-law of Robert L. Stevens by virtue of the joint resolution.

It is urged, in argument, that, if the right to the vessel itself did not pass, then the joint resolution must be construed as a transfer to the heirs of Robert L. Stevens of the right of action of the United States to recover against his estate damages for his non-performance of his contract, together with the securities, by way of mortgage and lien, it held as indemnity. We see no ground for a construction that leads to so remarkable a result. The plain meaning of the resolution is limited to a relinquishment on the part of the United States of any interest it might be supposed to have in the vessel, in which the heirs of Robert L. Stevens are mentioned, probably, be-

cause it was with him that the building contract was made; and if it could operate at all as a release, would be to them, for the benefit of those who, by law, had become his successors in the title; and that release would necessarily convey with it, as an incident, an extinguishment of the obligation of the contract for construction, and all the securities taken for its performance. It was in effect, and was doubtless intended as, a declaration, on the part of the United States, for the benefit of whom it might concern, of its entire abandonment of all further connection with the battery and the contract for its construction. The subsequent assent on the part of Congress to its acceptance by the State of New Jersey, as a bequest from Edwin A. Stevens, while it could not operate to affect any rights vested in the interval, is, at least, a legislative interpretation of its previous release. This resolution expressly recites that Edwin A. Stevens was the owner of the battery in his lifetime, and is scarcely more explicit in the recognition of his title than was the conduct of all the parties, including the present plaintiffs in error.

We are of opinion, for the reasons stated, that there is no error in the decree complained of, and it is accordingly

*Affirmed.*