THE JOHN B. KETCHAM, 2d.

GLOBE IRON-WORKS CO. v. HURON TRANSP. CO.

(Circuit Court of Appeals, Sixth Circuit. November 13, 1899.)

No. 694.

1. MARITIME LIENS — OHIO STATUTE — OWNERSHIP OF VESSEL WHILE BEING BUILT.

A person contracting to have a vessel built to be paid for in installments at fixed times, both before and after its completion, does not become the owner of such vessel until it is completed and delivered to him by the builder, although by the contract he is to furnish machinery to be used therein; hence one who sells him such machinery, which is delivered to and

placed in the vessel by the builder while it is still in his hands, is not entitled to a lien on the vessel therefor, under the Ohio statute relating to liens on water craft (Rev. St. Ohio, § 5880), which gives a lien for debts contracted on account of a vessel by the "master, owner, steward, consignee or other agent." [1]

**2. ADMIRALTY JURISDICTION—SHIPBUILDING CONTRACTS.**
A contract for the building of a ship is not maritime, or within admiralty jurisdiction, and a lien given by a local statute for materials furnished in the building may be enforced in state courts.[2]

## In Error to the Circuit Court of the United States for the Eastern District of Michigan.

This is a suit by the Globe Iron-Works Company, a corporation of the state of Ohio, against the steamer John B. Ketcham, 2d, her engines, boats, tackle, apparel, and furniture, and against all persons lawfully intervening for their interest therein, for the purpose of enforcing a lien thereon for the price of a boiler and appliances furnished for the original construction of said steamer under a contract with Oscar P. Bills and Edward E. Koch, partners under the firm name of Bills & Koch. The suit was begun in the circuit court for the county of Wayne, state of Michigan, under chapter 285, How. Ann. St., entitled "Collection of Demands against Water Craft." A warrant was issued, and the vessel seized thereunder. At the same time a summons was issued and served on the master of the vessel. Afterwards a bond was filed by the Huron Transportation Company, pursuant to the statute, conditioned to pay any judgment obtained against it, and the vessel was released by the sheriff. The Huron Transportation Company thereupon filed a demurrer to the complaint, upon the ground that the suit was one upon a maritime contract, and denying the jurisdiction of the state court to entertain such a suit. The demurrer was overruled. From this ruling the Huron Transportation Company took an appeal to the supreme court of the state of Michigan, where the judgment was affirmed, the opinion being reported in 100 Mich. 583, 59 N. W. 247. The cause was remanded to the circuit court for further proceedings, when the Huron Transportation Company, after filing an answer in which it asserted exclusive ownership of the vessel, removed the suit to the United States circuit court for the Eastern district of Michigan upon the ground of diversity of citizenship; said transportation company being a corporation of the state of New York, and the complainant a corporation of the state of Ohio. By stipulation, a jury was waived and testimony heard by the court, which made special findings of fact and law, and rendered judgment against complainant. The facts found by the court, so far as deemed necessary to the decision of the case, are as follows:

(1) Bills & Koch, a co-partnership engaged in business at Toledo, Ohio, on the 10th day of December, 1891, entered into a written contract with the Craig Shipbuilding Company, for the construction of a steamer. Said agreement being as follows: "The party of the first part agrees to furnish all material, and construct and deliver in the water at the place where built, a steel barge, to rate A1 star, 190 feet keel, 40 feet beam, 12 feet hold in the shoalest place, material to be the same weight as in the propeller J. W. Moore; said boat to have a steel deck, and boiler house, with hoisting engine, which will be connected with windlass by messenger, so it (the windlass) can be worked by steam. This agreement includes anchor chains, sails, masts, rigging, cabin outfit, which is to be plain. Party of the first part also agrees to take the engine and boiler from the steamer Germania, and erect it in the new boat, they to alter the old steam pipe to adapt it to the different relative positions of the boiler and engine in the new boat, but they are not to replace

---

[1] For maritime liens created by state laws, see note to The Electron, 21 C. C. A. 21.

[2] For jurisdiction in admiralty as to matters of contract, see note to The Richard Winslow, 18 C. C. A. 347, and, supplementary thereto, note to Board v. Howard, 27 C. C. A. 530.

anything on the boiler and engine except the piping or bolts and nuts, and lengthen the smokestack which may be destroyed in taking down and erecting in new boat. This boat to be commenced at once, and to be delivered about May 1st, 1892, barring fire, flood, strikes, railroad delays, or circumstances beyond their control. For and in consideration of the foregoing work, the parties of the second part agree to pay to the first party $60,000, as follows: $5,000, April 15th, 1892; $10,000, August 15th, 1892; $12,500, August 15th, 1893; $12,500, August 15th, 1894; $10,000, August 15th, 1895; and $10,000, October 15th, 1895. Time payment to draw interest at 7 per cent. per annum, and to be negotiable, notes secured by a mortgage on the boat, and policy of insurance to cover the amount of the notes." Bills & Koch made the payment of $5,000 due April 15, 1892, on the date due, but made no further money payment until September, 1892, when they paid the further sum of $3,333. February 15, 1892, this agreement was so modified as to allow Bills & Koch to procure and furnish in substitution another engine and boiler in place of those from the steamer Germania.

(2) Thereupon Bills & Koch contracted with the Globe Iron Works for the construction of a boiler and certain attachments, to be delivered to them f. o. b. cars at Cleveland, for the price of $3,772. The terms of payment were a four-months note, dated at delivery of boiler and attachments, to bear interest at 7 per cent.

(3) The Globe Iron Works were informed at the time this contract was made that said boiler and attachments "were designed and intended to be used in a steamboat then being built for Bills & Koch by the Craig Shipbuilding Company at Toledo."

(4) Shortly after the above contract, and before the delivery of the boiler as hereinafter stated, the Craig Shipbuilding Company "were informed of all the terms of said contract between the complainant and said Bills & Koch."

(5) At date of the contract between Bills & Koch and the complainant, "the hull of said vessel was yet upon the stocks upon the land, * * * partially constructed, but incomplete, and was not launched."

(6) By agreement, the Globe Company delivered the said boiler and attachments on board a steamer at Cleveland instead of upon railroad cars, and same was unloaded upon the docks of the Craig Company at Toledo, on May 15, 1892, and while the Ketcham was still upon the stocks. Shortly thereafter the vessel was launched, and the boiler and appliances placed therein by the Craig Company. Bills & Koch also furnished the engine and machinery used in the boat, same being of the value of about $5,000.

(7) The Ketcham was completed July 19, 1892, and was on that day enrolled in the name of the Craig Company as owner. About same time she was placed in possession of Bills & Koch, and was run by them on their own account upon the lakes, with the permission of the Craig Company, until about the close of navigation in 1892.

(8) July 21, 1892, Bills & Koch executed their negotiable note to the Globe Company for $3,936.33, same being dated July 21, 1892, and, by agreement with the Globe Company, made payable November 25, 1892. This note was the price of the boiler and appliances, with interest from May 15th, the day when the property was delivered. No part of this note has been paid.

(9) September 15, 1892, the Craig Company executed a bill of sale of the vessel to Bills & Koch, and on same day Bills & Koch executed a mortgage back to the Craig Company to secure a balance of about $45,000 due on construction contract. Both instruments were dated back to July 20, 1892. Default was made in the conditions of the mortgage, and the Craig Company took possession of the vessel, and on January 25, 1893, the same was sold under the mortgage, and bid in by the Craig Company for the amount of the mortgage debt. Prior to said sale, and on December 31, 1892, and before the Craig Company took possession under the mortgage, it received notice of the claim of the Globe Company here asserted.

(10) The Craig Company sold said vessel, January 28, 1893, to one Henry Loud, taking a mortgage to secure entire purchase price, and on April 13, 1893, Loud sold her to the present owner, the Huron Transportation Company. Both Loud and the Huron Transportation Company received notice, December 31, 1892, of the claim of the Globe Company and of the lien asserted by it.

H. Hatch and Harvey D. Goulder, for plaintiff in error.

John C. Sharo and T. E. Tarsney, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

LURTON, Circuit Judge, after making the foregoing statement of facts, delivered the opinion of the court.

The appellant, who was the complainant below, asserts a lien upon the John B. Ketcham, 2d, upon the facts already stated, by virtue of section 5880 of the Revised Statutes of Ohio, which is as follows:

"Any steamboat or other water craft navigating the waters within or bordering upon this state, shall be liable, and such liability shall be a lien thereon, for all debts contracted on account thereof by the master, owner, steward, consignee or other agent, for materials, supplies or labor in the building, repairing, furnishing or equipping of the same, or for insurance or due for wharfage, and also for damages arising out of any contract for the transportation of goods or persons or for injuries done to persons or property by such craft, or for any damage or injury done by the captain, mate or other officer thereof, or by any person under the order or sanction of either of them, to any person who is a passenger or hand on such steamboat, or other water craft at the time of the inflicting of such damage or injury."

The right to enforce the lien thus acquired under the Ohio statutes in a Michigan court is claimed under chapter 285, How. Ann. St. Mich. One section (8278) of that chapter is in these words:

"In cases where, by the general maritime law or laws of any other of the United States, now or hereafter to be passed, liens similar to those provided for in this act shall have been created against water-craft, the same may be enforced under the proceedings established by this act in like manner as if they accrued in this state, and chattel mortgages upon such water-craft, or other interest therein held in such other states, under the laws thereof, may be enforced hereunder against surplus proceeds, in like manner as if held in this state under its laws."

That the lien secured by the Ohio statute is a lien similar to those provided for by chapter 285, How. Ann. St., and may therefore be enforced under the procedure established by that chapter, has been expressly decided. Globe Iron-Works Co. v. The John B. Ketcham, 2d, 100 Mich. 583, 59 N. W. 247.

The primary question is this: Did the Globe Iron-Works Company acquire a lien under the Ohio statute, above set out, for the price of the boiler and attachments sold to Bills & Koch, and used in the construction of the John B. Ketcham, 2d? The answer must depend upon the relation which the purchasers bore to that vessel while in process of construction. When the contract was made by Bills & Koch with the Globe Company, and when the boiler, etc., were unloaded on the dock of the Craig Shipbuilding Company, the vessel, for which the Globe Company knew they were intended and designed, was yet on the stocks. The statute gives the lien only in favor of "debts contracted on account" of the vessel, "by the master, owner, steward, consignee, or other agent." Confessedly, Bills & Koch were neither the "master," "steward," nor "consignee" of the vessel. The contention is that they were the "owners," and that for this reason the statutory lien attached, if, as was the case, the articles were designed and intended for this particular vessel.

The learned trial judge found, upon the law and facts, that Bills & Koch were not the owners when this machinery was bought or delivered, nor until long after the vessel was delivered to them by the contractors. The rightness of this conclusion depends mainly upon the construction of the contract under which the vessel was being built for Bills & Koch as ultimate owners. That contract has been set out in full. It provides for a complete vessel. The contractors agreed to furnish all materials (the engine, boilers, etc., excepted), and to complete the ship in every particular, and deliver same May 1, 1892, certain contingencies excepted. Bills & Koch were to furnish, as needed, the engines, boilers, and attachments, and to pay $60,000 in money. The payments were to be made as follows: $5,000, April 1, 1892; $10,000, August 15, 1892; $12,500, August 15, 1893; $12,500, August 15, 1894; and $10,000, October 15, 1895. The contract does not in terms provide that the general property shall pass to Bills & Koch before completion and delivery of the vessel, and if under it the incomplete vessel passed to them it must be because such an intention is to be implied from the fact that a particular vessel was to be built for them, for which they were to furnish the engine and boilers, and upon which they were to make a payment in advance of completion and delivery. The general rule is that where one contracts for the building or making of a chattel, not existing in specie at the time, no property vests in the purchaser during the progress of the work, nor until the thing is finished and delivered. Butterworth v. McKinly, 11 Humph. 206; Mucklow v. Mangles, 1 Taunt. 319; Wood v. Bell, 5 El. & Bl. 772. There are certain exceptions to this general rule, the most specific of which is known as the rule in Woods v. Russell, 5 Barn. & Ald. 942, as interpreted in the later case of Clarke v. Spence, 4 Adol. & E. 448.

In Woods v. Russell the shipbuilder had contracted with the defendant to build a ship for him and complete her in April, 1819. The defendant agreed to pay for her in four installments,—one when the keel was laid, the second at the light plank, and the third and fourth when the ship was launched. The ship was measured, with the builder's privity, while yet unfinished, in order that defendant might get her registered in his name, and the builder signed the certificate necessary for her registry, and the ship was registered in defendant's name on the 26th of June, and he paid the third installment. On the previous March the defendant appointed a master, who superintended her building, and who chartered her on June 16th for a voyage, with the shipbuilder's consent. June the 30th the builder committed an act of bankruptcy, and the assignees in bankruptcy brought an action of trover against the defendant, who had taken possession before completion, but after the act of bankruptcy. It was held, on these facts, that the general property in the ship had passed to the defendant from the time of registration in defendant's name with the builder's consent.

In Clarke v. Spence, cited above, the contest was between the assignees of a bankrupt shipbuilder named Brunton and the plaintiff. In February, 1832, Brunton had agreed to build a ship for a

specified price, according to certain specifications, and under the superintendence of an agent appointed by the plaintiff. One installment was to be paid when the ship was rammed, a second when timbered, a third when decked, a fourth when launched, and the residue in four and six months thereafter. After the vessel had been rammed and timbered, and two installments of the price paid, and a part of the third installment paid in advance, Brunton became a bankrupt, having received in all £1,002. 11s., and the frame of the vessel was then worth £1,601. 13s. 7d. The title was held to have passed to the plaintiff. The court held that certain passages in the opinion in Woods v. Russell were "founded on the notion that provision for the payment regulated by particular stages of the work is made in the contract with a view to give the purchaser the security of certain portions of the work for the money he is to pay, and is equivalent to an express provision that, on the payment of the first installment, the general property in so much of the vessel as is then constructed shall vest in the purchaser."

To bring a case within the exceptions to the general rule, it is necessary to show that the intention of the parties was that the general property should pass to the purchaser at some stage of the building. Thus, in Laidler v. Burlinson, 2 Mees. & W. 602, Lord Abinger said: "There is no occasion to qualify the doctrine laid down in Woods v. Russell or Clarke v. Spence. I consider the principle which those cases establish to be that a man may purchase a ship as it is in progress of building, and, by the terms employed there, the contract was of that character; a superintendent was employed, and money paid at particular stages." In Wood v. Bell, 5 El. & Bl. 772, Lord Campbell, C. J., after stating the general rule in respect to the sale of a chattel to be constructed, said: "But these general rules are both and equally founded on the presumed intention of the parties. If, in the first, there are attendant circumstances from which the intention may be inferred that the property shall pass in the incomplete and growing chattel as the manufacture of it proceeds, or even in ascertained materials from which it is to be carried to perfection, that intention will be effectuated; and equally, in the latter, if it appear that the parties intended to postpone the transfer of the property till the payment of the price or the performance of any other condition, such intention will be upheld in the courts of law." "This principle," he added, "we believe to be well settled;" and, referring to the cases of Woods v. Russell, Clarke v. Spence, Laidler v. Burlinson, and others, cited in argument, he remarked that "previous decisions, therefore, are mainly useful as serving to guide our judgment in estimating the weight of circumstances as evidence of intention"; and concluded by saying: "Still it must be remembered, after all, that what we have to determine is a question of fact, namely, what, upon a careful consideration of all the circumstances, we believe to have been the contract into which the parties have entered." The fact that the purchase price is to be paid in installments, having relationship to the progress of the work, has not been generally

accepted by American courts as conclusive evidence of an intent that the general property in the incomplete chattel should pass to the purchaser. Benj. Sales, § 398 et seq.; Clarkson v. Stevens, 106 U. S. 505–515, 1 Sup. Ct. 200, 27 L. Ed. 139; Andrews v. Durant, 11 N. Y. 35; Williams v. Jackman, 16 Gray, 514; Green v. Hall, 1 Houst. 506; West Jersey R. Co. v. Trenton Car Works Co., 32 N. J. Law, 517; Elliott v. Edwards, 35 N. J. Law, 265. Butterworth v. McKinly, 11 Humph. 206, has been cited as approving the arbitrary rule of intention supposed to be established by Woods v. Russell. An examination of the case will show that this is a misinterpretation of the effect of Judge Totten's opinion. Clarkson v. Stevens, cited above, involved a contract between the United States and a shipbuilder, where the builder was to furnish the materials and labor, and to receive a sum, payable in installments, as the work progressed. After a review of many of the English and American cases, Justice Matthews said:

> "The courts of this country have not adopted any arbitrary rule of construction as controlling such agreements, but consider the question of intent open in every case, to be determined upon the terms of the contract and the circumstances attending the transaction. 1 Pars. Shipp. & Adm. 63. And such seems to us to be the true principle. Accordingly, we are of opinion that the fact that advances were made out of the purchase money, according to the contract, for the cost of the work as it progressed, and that the government was authorized to require the presence of an agent to join in certifying to the accounts, are not conclusive evidence of an intent that the property in the ship should vest in the United States prior to final delivery."

The contract under which the vessel in question was being constructed for Bills & Koch did not provide for payments of the purchase price as the work progressed, and did not provide for any superintendence by the purchaser during construction. But $5,000 of the price was to be paid in advance of completion and delivery, and that payment was without any regard to the proportion of the work then done. In the fact that the advance payment did not relate to the progress of the work on the vessel, the case is plainly taken out of the doctrine of Woods v. Russell and Clarke v. Spence, and is in accord with Williams v. Jackman, 16 Gray, 514–518. The fact that the engine and boilers were supplied by the purchaser, and worked into the steamer by the builder, does not alter the case. Whether we consider the furnishing of those articles as payment of part of the price of a completed steamer, or as the property of the buyer and put into the ship by the builder, the general property in the ship would remain in the builder, and the articles, if so attached as to become parts of the ship, would pass to the owner of the ship. The case in that respect is like that of the West Jersey R. Co. v. Trenton Car Works Co., 34 N. J. Law, 517, where the purchaser of certain cars furnished the plush which was worked into the seats of cars built for the buyer. This was held not to pass the title in the cars to the buyer. The view we have taken leads to the conclusion that Bills & Koch were not the owners of the vessel, either when the boiler and attachments were bought or when delivered in the shipyard of the Craig Shipbuilding Company, and could not, therefore, incumber the vessel with any lien,

under the Ohio statute. They bore no such relation to the ship or its builders as constituted them either the owners of the ship or the agents of the contracting builders.

The case of The Etna v. Treat, 15 Ohio, 585–589, is much in point, as it arose under the Ohio statute here involved. Trent contracted to build two canal boats for Standart, Griffiths & Co. for a specific price. Standart, Griffith & Co. were to furnish such materials out of their store as should be needed in course of construction, and pay $500 on delivery of the boats, and the balance as the boats earned the money. The hardware needed was furnished, and a small sum in money was paid when the boats were delivered. Without completing the payments for the boats, Standart, Griffith & Co. sold them for cash to a purchaser who had notice that they had not been paid for. Treat, the builder, sought to enforce a lien against the boats for the balance due him under the Ohio statute here involved. The court held that Treat continued to be the owner of the boats until he made delivery to Standart, Griffith & Co. Upon this subject the Ohio supreme court said:

"Treat had contracted to build her and deliver her at a particular time. Before the delivery she was, undoubtedly, his property. He was the owner and had the absolute control of her. He might have broken her up at any moment, and a sale and transfer by him to any stranger would have vested in that stranger a valid legal title. If transferred without notice of the contract between him and Standart, Griffith & Co., the purchasers would have had a perfect title to the boat,—one that nothing could have affected save the debts which Treat himself had contracted, as owner, for supplies, etc., furnished in building the Etna. For those debts the boat was liable, and a transfer by Treat to any person, or under any circumstances, without notice of those debts, or the assent expressly or tacitly given by them, would not have prevented Standart, Griffith & Co., or the hands that labored upon the boat in assisting to build her, from attaching and selling her, under the statute, to satisfy their claims. The object of the act was to provide a remedy for those who otherwise might be defrauded, hindered, or delayed in collecting their just claims, and to save them the inconvenience of seeking out the owners, and subjecting them to the payment of the debts contracted by their authority. Looking to this object and to the facts of the case, and all difficulty about the law or its application vanishes. Treat could not recover. His claim was not for a debt contracted for labor, supplies, or materials in the building of the boat. A debt cannot exist without a debtor and a creditor. It is something which grows out of a contract, and to every contract there must be two parties; the contractor, who is to be bound by it, and the contractee, to whom he is bound. Treat could not contract with himself to furnish himself materials for his own boat, any more than he could sue himself for breaking such a contract. Both ideas are absurd, one not more so than the other. His claim, then, is simply a claim for the price due upon the sale and delivery of the boat, and does not come within the letter or spirit of the statute."

The doctrine of this case was approved in Treat v. The Etna, 16 Ohio, 276, and Webster v. The Andes, 18 Ohio, 187. In the latter case the facts were that Lewis and Beardsley contracted for the construction of a brig of certain dimensions, for which they agreed to pay $24 per ton, custom-house measurement. The contract provided that Lewis and Beardsley might, as the work progressed, "pay in materials for building said vessel, or by paying for [sic] secure for same, at said Lewis and Beardsley's option, not exceeding an amount which shall be $2,000 less than the whole vessel

shall amount to; but may, if required by said Arnold, equal that amount; * * * the remaining $2,000 to be paid in six and fifteen months after delivery." It was further agreed "that said vessel, frame, and materials shall remain in the possession of said Lewis & Beardsley as fast as got out or put together, as a guaranty that the said vessel shall be built and finished as above," and that Arnold, the builder, should have a lien after completion and delivery to secure the aforesaid balance of $2,000. The suit was by a laborer who had been employed by a contractor under Arnold, the builder, to enforce a lien under the Ohio water craft lien law now here involved, against the vessel after it had been paid for and delivered to the purchasers, Lewis and Beardsley. The Ohio court held: First, that Lewis and Beardsley, by the building contract, in order to secure their advancements, had "stipulated for the ownership and possession of the vessel from the laying of the keel upwards"; that thereby Lewis and Beardsley had "brought themselves most clearly within the meaning of the statute, as the owners of the Andes, when the labor was performed by the plaintiff." Second, that the plaintiff was entitled to a lien under the statute, having performed work upon the vessel at the instance of those at the time in the rightful control thereof. In other words, the court found that under the building contract the purchasers contracted for the ownership and possession from the laying of the keel up, and that the builder was in control of the construction as the mere agent of the owner, and might therefore charge the vessel with a lien for work and labor done on the vessel. The conclusion was clearly right upon the facts, but the case has no bearing here, because Bills & Koch were not the owners, and were not in possession through the Craig Company or otherwise.

The defendant in error has insisted that the contract here involved is a maritime contract, of which the admiralty courts of the United States have exclusive jurisdiction. The contract between the appellant and Bills & Koch was for the construction of machinery for a vessel in course of construction, and before it was launched. Such a contract is a nonmaritime contract, and liens arising under state laws out of such contracts may be enforced in state courts. In The J. E. Rumbell, 148 U. S. 1–11, 13 Sup. Ct. 498, 37 L. Ed. 345, it is said:

"It is now settled that a contract for building a ship, being a contract made on land, and to be performed on land, is not a maritime contract, and that a lien to secure, given by local statute, is not a maritime lien, and cannot, therefore, be enforced in admiralty."

There is no error, and the judgment is affirmed.