SIDNEY POWERS, Appellant, *v.* JOHN T. GREEN, Appellee.

### APPEAL FROM DU PAGE.

Where a debtor, in failing circumstances, by way of preference, makes a bill of sale of his stock in trade, household furniture, &c., to one of his creditors, and is thereupon employed by such creditor as his head clerk, or agent, to manage the business in the name of his principal, the purchaser, and, at the same time, such debtor retains possession of the household furniture, under a lease from the purchaser, such a transaction, though calculated to raise suspicion of collusion, is not conclusive of fraud, and may be explained. And when, in such a case, a jury have found a verdict in favor of the purchaser,

and there was evidence warranting such a verdict, it will not be disturbed, even though the court might have differed in opinion with the jury, had they been sitting, in the first instance, as tryers of the case.

This cause was tried at the October term, 1852, of the Du Page Circuit Court, HENDERSON, Judge, and a judgment in favor of the plaintiff below, from which judgment the defendant below appealed.

The facts of the case sufficiently appear in the opinion of the court.

J. N. ARNOLD, for appellant.

T. HOYNE, for appellee.

SCATES, J.   To an action of replevin the defendant Powers made conusance, that as sheriff he took the goods as the property of one Lyman, under an execution; and that the goods belonged to Lyman.   Upon a motion for a new trial, we are called upon to review the facts, and two instructions of the court below.

In failing circumstances, and after suit brought, but before the judgment upon which this execution issued, Lyman made a bill of sale to Green, of a stock of goods, his household furniture, &c., by way of preference, and to whom in a short time after he delivered the goods as they were in the store, with the furniture, &c., stored in the upper chamber of it.   Green lived in New York City, where he was employed as a bookkeeper, and where the bill of sale was made.   He came out to Naperville, and spent some half a day in looking over the stock, and employing Lyman as his agent and principal clerk, retaining the former clerks in Lyman's employment, and rented to Lyman a house, with the use of the furniture.   He changed the sign, putting up his own name, and caused an advertisement of his purchase to be made in the paper of the village.   Through Lyman, soon after, he purchased ten or twelve thousand dollars' worth of goods, and added to the stock, and so continued the business.   It appeared that Lyman was indebted to Green for cash loaned; at sundry times, part of which had been paid to plaintiff in execution, in the course of trade, and on divers acceptances, amounting to about $2,500.   The bill of sale amounted to about $4,000; but the goods being remnants, and unsalable, were put at cost, including charges, and fifty per cent. thereof deducted, which reduced the amount below the whole indebtedness, but was taken in full discharge of $1,705.41, with the

interest due thereon. Green was under contract to serve his employers as bookkeeper for some time, and could not leave them. The storehouse was worth about $1,500, and was encumbered for $2,000. Green bought it of Lyman for $100. Lyman's residence was estimated to be worth from $500 to $700, and encumbered for $350. He sold that to Green for $300. A pair of horses and a wagon were among the property bought by Green. The horses were brought out and examined by him, and directed to be sold; but this direction was not followed, and they were used for doing the hauling for the store as theretofore.

Lyman made over other property in Chicago, mortgaged, to his mother, for its value to her in satisfaction of her debt. He secured another firm in Chicago, to whom he was indebted; and assigned the remainder of his property for the benefit of his creditors. He had been arrested at the suit of Cooley, Wadsworth & Co., and as soon as he gave bail in that case in Chicago, he went to New York, and executed this bill of sale to Green, who, in a few days after, took possession, as stated; and has continued doing business ever since through him, as agent, and employing his old clerks.

Lyman had done business at so low profits on sales as barely to cover expenses, while doing business for himself. Green rented Lyman the dwelling-house and furniture at $50 per year, and he had it in possession at the date of the levy on the furniture. The defendant below objected to the two following instructions by plaintiff: " Actual fraud is not to be presumed, but should be proven by the party alleging it; therefore, if the jury believe from all the circumstances in evidence, that the nature and design of the sale in question were *bonâ fide*, to secure and pay Green, the plaintiff, an indebtedness due to him by Lyman, and that Lyman had received advances of money from time to time from plaintiff, and not contrived as a fraud on the part of the plaintiff, to cheat or hinder other creditors, the law is for the plaintiff. In all cases of alleged fraudulent sales, a knowledge of, or participation in, the fraud, must be shown on the part of the buyer, as well as the seller, in order, in this case, to defeat the recovery of the plaintiff.

" If the jury shall believe from the evidence, that the sale from Lyman to the plaintiff, Green, was *bonâ fide*, and that the plaintiff, at the time of such sale, and since, has been confidential clerk and bookkeeper for a mercantile house in the city of New York, and resides there ; then, if the jury shall believe from the evidence that, under such circumstances, Lyman acted, after the sale, as agent for the plaintiff, and that the plaintiff was

unable· to give his personal attendance, such circumstances in law rebut any imputation of fraud, if they believe the transaction was in good faith, and not in fraud of creditors, and that there was a substantial change of possession following the sale."

The court refused a new trial; and the assignment of errors presents the simple question, Was this a *bonâ fide* sale and delivery of the property for a valuable consideration, and not merely colorable, or, in fraud, hinderance, and delay of creditors? We are of opinion there is no error, under the proofs, in instructions, and that the verdict should not be disturbed.

The jury have found that the sale was made in good faith, in payment of an existing indebtedness, which seems fully warranted by the evidence; and although it was in preferment by a failing debtor, yet when made in good faith and fairly, it is warranted by law. Howell et al. *v.* Edgar et al., 3 Scam. R. 417.

The contract must be made both in good faith and upon a valuable consideration, and accompanied and followed by possession. So the doctrine was laid down in Twine's Case, 3 Coke, R. 80 (1 Smith's Lead. Cases, 1; 18 L. Lib. 33), which was followed by Edwards *v.* Harben, 2 Term R. 597; and adopted by our own court in Thornton *v.* Davenport et al., 1 Scam. R. 298; and subsequently approved in Rhines *v.* Phelps et al., 3 Gil. R. 464, and Kitchell *v.* Brotton, 1 Scam. R. 302. Indeed, I may say, there is no controversy on this point; nor on the cases that form exceptions to this general rule, as to the necessity of immediate change of possession; embracing mortgages, antenuptial settlements, and post nuptial, made in pursuance of antenuptial agreements, sales by public officers, conditional sales, where the continuance of possession is not only provided for in the sale, but fair and consistent with the objects and purposes of the transaction; and cases of impossible delivery, as of a ship at sea, or of heavy articles, in which a delivery of the muniment of title for the time being, with actual possession on arrival, or a symbolical delivery, as of ·a key of a warehouse where the goods are stored, will answer. I need not refer to the numerous authorities for these exceptions and distinctions, there being but little difference on these points. 1 Smith's Lead. Cases, 1 to 14; 18 Law Lib. 33 to 74, contains a review of English and American decisions on the general subject. It is not contended, in this case, that the sale would have been good without a delivery, notwithstanding a previous indebtedness is deemed a valuable consideration, and a preference may be *bonâ fide* made.

33*

The objection raised is to the fact of delivery, and a continuation of the possession in the purchaser. The jury found that there was a delivery, and that possession was retained by vendee; but we are called to review the sufficiency of the evidence upon which they so found. And, in this point of view, it is insisted that as Green came into the store at noon, and made but a superficial examination of the property, and left next morning, and did not again return until after the levy; but immediately employing Lyman as his agent, and putting him into immediate possession, as such, of the goods, and, by lease, of the dwelling and furniture, that the whole transaction was but a colorable delivery, and did not change the possession, and is, therefore, a fraud *per se*, according to Thornton v. Davenport et al.; Archer v. Hubbell, 4 Wend. R. 517; Paget et al. v. Perchard et al., 1 Espin. R. 205; Wordall v. Smith et al., 1 Camp. 332; McBride v. McClelland, 6 Watts & Serg. 94; Young v. McClure, 2 Ib. 147; Goldsbury v. May, 1 Litt. R. 255; Twine's Case, 3 Coke, R. 80.

The apparent difficulty in this case arises from the fact, that Lyman was employed as agent and head clerk, to take charge of and sell the goods, and conduct the business. Had Lyman entirely withdrawn, no one could have thought of objecting to the sale on the grounds of delivery. The explanation offered is, that Green had engaged for a term unexpired, as bookkeeper for a New York house, and could not, therefore, give his personal attention. Lyman's failure had made it necessary for Green to take property to secure his debts; the stock was of unsalable remnants, without additions; it was necessary to carry on the business in order to make sales of the stock. Lyman had experience in trade in the place, and he, therefore, employed him, with the clerks in his employment, advertised the purchase, put a sign in his own name, and had the books kept, and the business carried on in it. It would hardly be contended that he could not do business in the same house; but it is, in effect, contended, that he could not employ Lyman to transact his business, nor rent him the use of part of the property. This, we think, untenable. Green came out and took immediate possession, by announcing his purchase, looking over and seeing that the goods were on hand, advertising it in the village newspaper, and putting up the usual evidence of ownership, his name on the sign. He could do no more, unless, indeed, he give his personal attention to the business, remove the goods from the house, or refuse to employ Lyman as a clerk. It would be unreasonable, and, therefore, the law would not require either of these acts in addition to what he did. The employment of

Lyman, under the circumstances, was well calculated to raise suspicion of collusion and a trust. But it is not to be taken as conclusive, and we think it fully explained. By his sign, he announces to every one his ownership of that stock of goods, and that he is doing business there. Lyman's possession, under these circumstances, can mislead no one to deal with or trust him as owner, from such a possession. The same reasoning may extend to the leased furniture, though with much less force of conviction, as use and custom have fixed no visible sign to the community as evidence of ownership, except possession or recorded title papers. But the same objection could be made to any lease of such property, although purchased of another. This point is not without authority, however, which puts it upon the same general principle of property in general, and that the fact of a *bonâ fide* delivery. Such a redelivery upon lease or hire was sanctioned in Lyndor *v.* Gee, 4 Leigh, R. 535; Lewis *v.* Adams et al., 6 Leigh, R. 320; Archer *v.* Hubbell, 4 Wend. R. 517; French *v.* Hall, 9 N. H. R. 145.

The reason in the cases where this has not been allowed, seems to be because the sale and delivery and redelivery were in a secret manner, and unknown to the community, or that the circumstances showed it to be only colorable. Coburn *v.* Pickering, 3 N. H. R. 415, is of the latter kind; Paul *v.* Crooker, 8 Ib. 289; Trask *v.* Bowers, 4 Ib. 309.

The law will, then, sanction a fair, *bonâ fide* transaction, and not deem in every case a redelivery fraudulent, when made for fair and honest purposes, consistent with the objects and purposes of a *bonâ fide* sale, and under circumstances not calculated to impose and deceive the community by apparent ownership arising from possession. We are aware that the more recent such a lease, hire, and redelivery takes place after the sale and delivery, the more difficult it becomes to sustain the latter by an explanation of the former. The case under consideration is, we think, one so satisfactorily proven and explained, both as to the goods and the furniture, as to justify a refusal to disturb the verdict of the jury, even though we might have differed in opinion with them as to the furniture, sitting as tryers in the first instance.

*Judgment affirmed.*