MONTFORD C. HOLLEY, Appellant, v. A. W. HAILE MOTOR COMPANY and ARTHUR W. HAILE, Respondents.

Fourth Department, July 1, 1919.

Sale — conversion — validity of unfiled conditional contracts of sale as against subsequent purchaser in good faith — presumption of fraud from retention by seller of possession of goods sold — evidence rebutting said presumption — res gestæ — principal and agent — instruction of jury as to question not in issue.

In an action for the alleged conversion by the defendants of automobiles alleged to belong to the plaintiff it appeared that a subagent, being required to pay cash for cars purchased from the defendant corporation, executed a bank note as maker which the plaintiff indorsed and had the proceeds passed to a new account from which he drew money to enable the subagent to purchase the cars, receiving invoices and insurance

on each car for his protection. Thereafter plaintiff and the subagent executed an agreement in writing providing, in effect, that plaintiff had bought cars for sale by the subagent, as his agent and to finance the deal had indorsed a note of the subagent who was to store the cars, keep them insured and sell them as soon as possible on plaintiff's account and apply the proceeds to the payment of the note. The subagent absconded while the cars in question, procured pursuant to the aforesaid agreement, were in his garage and the defendant corporation through its president took said cars into its possession. The defendant corporation claimed title to the cars under conditional contracts of sale accompanied by notes given to it by the subagent but said contracts were never filed.

*Held,* that assuming that the conditional contracts covered the automobiles in question as claimed by the defendants they were void as against the plaintiff, if he was a subsequent purchaser in good faith, because they were not filed.

The evidence indicates that the plaintiff purchased the automobiles of the subagent in entire good faith and believed that the money furnished by him went to the defendant corporation to pay for said automobiles.

Under the common-law rule now embodied in section 107 of the Personal Property Law the retention of the possession of the automobiles by the subagent was only presumptive evidence of fraud and said presumption was rebutted by the evidence showing the good faith of the transaction.

Since the taking of the automobiles by the defendant corporation was wrongful the nonsuit in favor of its president was erroneous.

The plaintiff should have been permitted to show as part of the *res gestæ* that the subagent turned over to him the proceeds of the sales of the automobiles which the plaintiff had purchased, and it was error to exclude evidence to that effect.

It was also error, under the evidence, to submit to the jury the question whether or not the subagent was plaintiff's agent in buying the cars from the defendant corporation.

The court should not have instructed the jury at the request of counsel for the defendants that where personal property is sold and the physical possession thereof remains in the seller and no instrument is filed in any place where required the sale is presumed to be fraudulent as against a *bona fide* purchaser and creditors under the law as said question was not in the case.

KRUSE, P. J., dissented, with memorandum.

APPEAL by the plaintiff, Montford C. Holley, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of Niagara on the 16th day of December, 1918, upon a dismissal of the complaint by direction of the court at the close of plaintiff's case as to the defendant Arthur W. Haile, and upon the verdict of a jury as to the defendant A. W. Haile Motor Company, and also

Fourth Department, July, 1919.                [Vol. 188.

from an order entered in said clerk's office on the 19th day of December, 1918, denying plaintiff's motion for a new trial made upon the minutes.

*Abner T. Hopkins* [*Judson & Holley,* attorneys], for the appellant.

*E. C. Schlenker* [*Falk, Phillips & Schlenker,* attorneys], for the respondents.

DE ANGELIS, J.:

The action was brought to recover damages for the alleged conversion by the defendants of five automobiles alleged to belong to the plaintiff.

The answers admit the incorporation of the defendant corporation and the demand for and refusal to deliver the automobiles and deny the other allegations of the complaint.

This is a review of the second trial of the action. Upon the review of the first trial we reversed a judgment in favor of the plaintiff and granted a new trial for an error of the trial court in excluding evidence offered by the defendants to show that the automobiles were bought on contracts of conditional sale. (185 App. Div. 904.)

The following facts are undisputed:

One Theodore J. Farley, for three or four years prior to June 13, 1917, had been in the automobile business and had a public garage in the city of Lockport in the county of Niagara. He was subagent for and sold Studebaker motor cars or automobiles, had a large building, stored cars, had his place full of cars in winter, sold gasoline, oil and tires, and had a repair shop with two men working and sometimes more. The defendant A. W. Haile Motor Company, a domestic corporation, doing business in the city of Buffalo, was general agent for the Studebaker motor cars or automobiles for Western New York which includes Niagara county. Farley purchased all the Studebaker cars which he handled from A. W. Haile Motor Company in Buffalo. On the 13th day of June, 1917, Farley absconded. Since that time and up to the time of the trial he had not been found although efforts were made by the defendants to find him. At the time of his departure there were in his garage five Studebaker cars which

he had purchased from A. W. Haile Motor Company, two six-cylinder cars serial numbers 204176 and 204582, and three four-cylinder cars serial numbers 113233, 114227 and 115397. On the 14th day of June, 1917, A. W. Haile Motor Company, through the defendant Arthur W. Haile, its president, took these cars from Farley's garage into its possession. Thereafter and on the 15th day of June, 1917, Montford C. Holley, the plaintiff, made a demand upon A. W. Haile Motor Company for the delivery to him of the five cars which demand was not complied with.

This action was begun June 21, 1917.

There is no serious conflict in the testimony of the witnesses except as to the condition of the cars and their value. Except as to the condition of the cars and their value the plaintiff was the only witness in his own behalf, and the defendant Arthur W. Haile, being also the president of the defendant corporation, was the principal witness in his own behalf and for the defendant corporation. One Hugh H. Price, who at the time of the trial was in the military service of the United States and out of the jurisdiction of the court, would have been a material witness for the defendants. Under an arrangement of counsel, however, the defendants read in evidence part of the testimony given by him on the first trial. He was at that time in the employ of the defendant corporation and had to do with the transactions between the defendant corporation and Farley, involved in the lawsuit. The testimony of these witnesses was the subject of criticism, because of their interest in the litigation.

I shall take up a consideration of the plaintiff's testimony first. It was in substance to the effect that in the middle or latter part of October, 1916, Farley applied to the plaintiff for a loan on the garage in order that he might buy three cars which were in the defendant corporation's salesroom in Buffalo which could be bought for the old prices, so that he might have cars on hand to sell, because he had learned that prices were going to advance and, on account of war times, the company would not guarantee deliveries. Theretofore Farley had been accustomed to buy and pay for one car at a time. The plaintiff told Farley that he had no money to loan

Fourth Department, July, 1919.          [Vol. 188.

and could not get a loan on the garage. Farley told plaintiff that if he could not devise some way to get some money he might as well go out of business. The plaintiff finally suggested that he might buy the cars and that he would think the matter over. Finally in November Farley came again to the plaintiff's office and the plaintiff told him that he would buy the three cars. The plaintiff said: " To buy those cars you have to pay for them when you get them? " Farley said: " Yes, I can't get these cars unless I put down the money when I get the cars." The plaintiff said: " I supposed that was so." The plaintiff said: " I told you the other day you were here I didn't have any money; that simply means now if I were going to do this thing, go into this thing and help you out and buy these cars I will have to get money somewhere. * * * Of course, I can get it over at the bank. I presume I can have my wife sign a note with me and I could get what money I want. There won't be any trouble about that. * * * For that matter I don't see why you couldn't sign the note as well as anybody else. * * * There wouldn't be anything to it as far as you are concerned, it wouldn't be anything but an accommodation note. * * * Of course I would have to have two signatures on this note over at the bank in order to get it discounted." Farley said that " he didn't care how it was done; " that the plaintiff could do it any way he wanted to; that " he didn't want any money;" that what he wanted was some way to get the cars. The plaintiff said: " I will tell you what we will do, we will get the money in that way at the bank, if that is agreeable to you." Farley said that was all right. Then the plaintiff said to him: " I don't want to go into this deal and put up several thousand dollars without any compensation." Farley said that he did not want him to. The plaintiff said: " How much profit is there in these cars any way? " Farley said that there was about $200 profit in each car. Plaintiff said: " I will tell you what we will do. We will make up a note for this amount, whatever amount is necessary to get these cars, and I will undertake to get the money from the bank, so when you get ready to go after these cars, * * * they can be paid for. * * * You will have to put these cars over in your garage, so you will have to get them insured,

you will have to take care of them and store them and sell them; when they are sold I shall expect whatever money I put up to be paid back. * * * I think I ought to have fifty dollars on each car." Farley said that that was very satisfactory to him and. that "he didn't think that he would be able to arrange so that he could have such a large percentage." The plaintiff told him that he "didn't want it all." The plaintiff said: "You have got to do the work and you have got to take care of these cars and I want you paid, and if that is satisfactory to you, it is to me. * * * When do you want to get these cars?" Farley said that he did not know, in a few days. Plaintiff said: "Well, there is no use of doing anything about it now, you don't want to get them now. * * * When you get ready to get them you come in here and we will fix this matter up just as we have talked, and I will undertake to see that the money is provided so that these cars can be paid for." Farley said that was all right and went away. The plaintiff did not see anything more of Farley until Monday morning, November 27, 1916, when a few minutes after he got to his office Farley came in and told him that he had been up at Buffalo Saturday and brought down one of those cars and that he had it down at the foot of the stairway. The plaintiff looked out of the window and saw the car and said: "I thought you were going to come in here before you went up to get the cars?" Farley said: "I don't know but what I said I would, but * * * I was up Saturday and I could get this car all right; I thought it didn't make any difference to you and so I brought it down." The plaintiff said that it did not make any difference to him and he did not care anything about it.

Thereupon Farley took from his pocket an invoice for the car for $741.15 showing the receipt of payment November 25, 1916. Farley stated that he would like to get another car that day and the third one the next day if the weather held good. The plaintiff then said that if Farley was "going to get these cars as fast as this I don't see any use in making out a note on each car," but they might as well put the whole thing into one note. The plaintiff said: "You can figure this thing up here and see what it is and you can go and get this car insured and I will go over to the bank and take care of the money end of

it, and possibly by the time you get back here with the insurance policy I will be able to give you the check for this car." Thereupon the plaintiff and Farley made figures of the prices of the three cars, the two four-cylinder cars and one six-cylinder car, and added to the sum of them $150, $50 for the plaintiff for each car, and the plaintiff drew a note for the amount payable at the Exchange Bank to his order three months from date. Farley signed it as maker, the plaintiff indorsed it, took it to the bank, got it discounted and had the proceeds passed to a new account opened by him in the name " M. C. Holley, Auto Account." He returned to his office and Farley came there with the insurance on the car and handed the slip to the plaintiff. The plaintiff sat down to write out a check on this new account for $741.15, the price of the car already received, when he said to Farley: " This thing is running into quite an amount of money. * * * I don't know but what we better have something in writing to cover the transaction in some way or another. * * * I may die or you may die or anything might happen to us." The plaintiff then prepared in typewriting a memorandum and a carbon copy of which the following is a copy:

" I have bought for sale by Theo. J. Farley, as my agent two Studebaker fours and one Studebaker six automobiles and to finance the deal have endorsed the note of said Farley dated this day for $2545.65 and interest. Said Farley is to store said cars at his garage and keep same insured at his expense and to sell same as soon as possible on my account. As fast as the cars are sold the moneys derived from the sales are to be applied to pay said note and interest until same is fully paid. In case of any renewals of said note said Farley is to pay the interest and discount. All moneys realized by Farley by the sales after paying the said note in full are to belong to him for his services in the matter.

" Dated November 27th, 1916.

" MONTFORD C. HOLLEY.<br>" T. J. FARLEY."

They both signed the original, which the plaintiff retained, and the plaintiff signed the carbon copy and delivered it to Farley.

Thereupon the plaintiff drew the check for $741.15 payable to the order of Farley, signed the same and delivered it to Farley.

The next day Farley came to the plaintiff's office with a receipted invoice for the other four-cylinder car, delivered the invoice to the plaintiff, got the insurance slip to cover it and handed it to the plaintiff and thereupon the plaintiff gave him a check upon the same account dated November 28, 1916, for $741.15 payable to the order of Farley.

On the 29th day of November, 1916, Farley again came to the plaintiff's office, said he had gotten the six-cylinder car and delivered to the plaintiff the receipted invoice for the same. Then Farley got the insurance slip for that car and delivered it to the plaintiff. Thereupon the plaintiff handed Farley another check dated that day and payable to the order of Farley for $913.35, being fifteen cents less than the price of the car.

The three invoices and the three checks were produced by the plaintiff and put in evidence. The checks showed that they had been paid at the bank.

The six-cylinder car, serial number 204582, is one of the cars involved in this controversy.

About the middle of December, 1916, it was arranged between Farley and the plaintiff that the plaintiff would buy another six-cylinder car under the same arrangement. On the 19th day of December, 1916, Farley came to the plaintiff's office, gave the plaintiff the insurance slip to cover the six-cylinder car, said he had an invoice for the car, but must have left it at his home. The plaintiff made out a note for $963.35, being the sum of the price of the car, $913.35, and the $50 going to him, payable three months from date to the order of Farley. Farley signed the note as maker, the plaintiff indorsed it, got it discounted at the bank and the proceeds passed to the credit of his auto account. The plaintiff took the memorandum of November twenty-seventh from his safe and wrote on the bottom of it the following and he and Farley signed their names thereto:

"*Dec.* 19, 1916.

"One additional Studebaker Six bo't today under same conditions. Note given by Farley today $963.35, due 3 months with interest."

Then the plaintiff gave Farley a check on the auto account for $913.35 to pay for the car. This check was received in evidence and showed that it had been paid by the bank. The car was serial number 204176 and is involved in this controversy.

In January, 1917, Farley told the plaintiff that he wanted to get some new model cars and after the matter was talked over the plaintiff agreed under the same arrangement to buy three more cars, one six-cylinder car and two four-cylinder cars. On the 31st day of January, 1917, Farley came to the plaintiff's office, said he had the three cars down from Buffalo and handed the plaintiff the receipted invoices for them and the insurance slips covering the cars. The plaintiff made out a three months' note payable to the plaintiff's order for $2,728.20, being the sum of $2,578.20, the price of the cars, and $150, being $50 for him for each car. Farley signed the note as maker, the plaintiff indorsed it and got it discounted at the bank and the proceeds passed to his credit in the auto account. The plaintiff wrote in the corner of the invoice the following which both the plaintiff and Farley signed:

" Above cars hereby included in and covered by written agreement of November 27, 1916, on same terms and conditions. January 31, 1917."

Then the plaintiff gave Farley a check payable to his order dated January 31, 1917, for $2,578.20, the price of the cars. The invoice, the writing on it and the check were received in evidence. The check showed that it was paid by the bank. The insurance slips, one for each car, were also received in evidence. They were alike in form and one of them is as follows:

" CERTIFICATE OF INSURANCE.

" $750. No. 5889.

" BOSTON INSURANCE COMPANY
Boston, Massachusetts.
" Capital One Million Dollars.

" This certifies that T. J. Farley insured under and subject to the conditions of Open Automobile Policy No. 32583 of this company, Seven Hundred Fifty Dollars upon Automobile Manufacturers Number 14092, Built by Studebaker in the year

1917, Model 4 Cyl. Type Touring, Horse Power 24, from January 31, 1917, noon, to January 31, 1918, noon.

" Loss if any payable as provided in the policy upon surrender of this certificate.

" This certificate is not valid until countersigned by ................................... at Lockport, N. Y.

" January 31, 1917.

" H. D. ALLEN, *Prest.*

" Loss, if any, payable to M. C. Holley as his interest may appear.

" THE SHAPLEIGH WRIGHT CO. *Agent.*
" WM. C. SHAPLEIGH."

The serial numbers of the four-cylinder cars are 114227 and 115397 and the serial number of the six-cylinder car is 211318.

Only the two four-cylinder cars, serial numbers 114227 and 115397, are involved in this controversy.

In March, 1917, the plaintiff and Farley made an arrangement for the purchase by plaintiff of two more cars, one four-cylinder car and one six-cylinder car. On the 5th day of March, 1917, Farley delivered to the plaintiff two receipted invoices, one for a six-cylinder car at $990.60, and the other for a four-cylinder car at $793.80. They were receipted February 28, 1917. Farley also delivered to him insurance slips for the two cars. The plaintiff drew a note for $1,884.40, being the sum of the prices of the two cars and $100, $50 for each car. Farley signed the note as maker and the plaintiff indorsed it and got it discounted and the proceeds passed to his auto account. Thereupon he wrote on each invoice the following which was signed by Farley:

" Above car hereby included in and covered by written agreement of Nov. 27, 1916.

" March 5, 1917."

Thereupon the plaintiff gave to Farley a check on the auto account payable to his order for $1,784.40, the price of the cars.

The invoices with the written agreements thereon, the check and insurance slips were received in evidence. The check showed that it was paid by the bank. The serial

number of the four-cylinder car was 113233 and of the six-cylinder car was 213743.

Only the four-cylinder car is involved in this controversy.

The defendant Arthur W. Haile maintains that the nonsuit as to him was right because he did not act in his individual capacity in taking away the automobiles.

The defendants assert that the plaintiff had no title to the automobiles and, therefore, cannot, in any event, recover.

The defendant corporation, making no claim to have had a lien on the four-cylinder car, serial number 114227, insists that it had a right to take and hold the other cars because it retained title to them under conditional contracts of sale accompanied by notes given to it by Farley for the purchase price thereof and renewals of the same from time to time. It is conceded that these contracts were never filed.

The testimony of Arthur W. Haile, called as a witness on behalf of the defendants, and the part of the cross-examination of Hugh H. Price from the record of the first trial, read on behalf of the defendants, together with the defendants' books and the renewal notes and contracts of conditional sale, tend to show that, at the time the defendant corporation took into its possession the six-cylinder car, serial number 204176, there was outstanding Farley's note for $800, dated May 31, 1917, payable to the defendant corporation June 15, 1917, with interest, accompanied by a conditional contract for the retention of the title to such car in such defendant till the note was paid; tend to show that at the time the defendant corporation took into its possession the six-cylinder car, serial number 204582, there was outstanding Farley's note for $500, dated June 5, 1917, payable one month from date to the order of the defendant corporation, with interest, accompanied by a conditional contract for the retention of the title to such car in such defendant till the note was paid; tend to show that at the time the defendant corporation took into its possession the four-cylinder car, serial number 113233, there was outstanding Farley's note for $400, dated May 31, 1917, payable to the order of the defendant corporation June 10, 1917, with interest, accompanied by a conditional contract for the retention of the title to such car in such defendant till the note was paid; tend to show that at the time the defendant

corporation took into its possession the four-cylinder car, serial number 115397, there was outstanding Farley's note for $450, dated May 31, 1917, payable to the order of the defendant corporation June 25, 1917, with interest, accompanied by a conditional contract for the retention of the title to such car in such defendant till the note was paid.

Upon the first trial it seems that the battle was waged principally over the question whether or not the plaintiff was simply a general creditor of Farley. The learned justice presiding at the trial now under review appears to have been specially impressed with the evidence upon which the defendants argued that the plaintiff bought the automobiles when he knew or ought to have known of the conditional sales contracts of the defendant corporation.

The claim of the defendants that the plaintiff erased from the invoice of November 28, 1916, the words " by note $600; by cash $313.50," has no substantial basis in the evidence.

The defendants seem to regard the way in which the notes were given by which the plaintiff raised the money to pay for the automobiles and the manner of the insurance as strongly indicating that the plaintiff was not the purchaser of the automobiles in good faith. I do not so regard them. The use of the notes was to get the money from the bank and the money was to be obtained by the plaintiff. It was a much better banking proposition to present to the bank the note signed by Farley as maker than for the plaintiff to appear as maker and Farley as accommodation indorser. The property in the garage was covered by blanket policies of insurance and it was entirely proper and usual to deliver slips just as the slips in question were delivered.

Assuming, without deciding, that the conditional contracts covered the four automobiles as claimed by the defendants, they were void as against the plaintiff because they were not filed if he was a subsequent purchaser of the automobiles in good faith. (Pers. Prop. Law [Consol. Laws, chap. 41; Laws of 1909, chap. 45], § 62.) I am of the opinion that all the evidence indicates that the plaintiff bought these automobiles of Farley in entire good faith; that so far from having any thought of wronging the defendant corporation, he believed that he was furnishing the money and that it

went to the defendant corporation to pay for these automobiles, so that at the time they were taken by the defendant corporation the plaintiff owned them. In that case, of course, the plaintiff cannot be charged with any fraud in fact.

Farley having remained in possession of the automobiles after they were sold to the plaintiff, although such retention of possession was not fraudulent in fact as I have already indicated, it might be deemed fraudulent under some rule of law within section 107 of the present Personal Property Law. I do not think that the defendant corporation was in a position to treat the sales as void in any event. However that may be, the legislation, beginning with Revised Statutes, part 2, chapter 7, title 2, sections 5 to 7 (2 R. S. 136, §§ 5–7), appearing revised in the former Personal Property Law (Gen. Laws, chap. 47; Laws of 1897, chap. 417), section 25, and in the Personal Property Law (Consol. Laws, chap. 41; Laws of 1909, chap. 45), section 36, was repealed by the Sales of Goods Act which went into effect September 1, 1911 (Laws of 1911, chap. 571, adding to Pers. Prop. Law, §§ 82–158), and, so far as the same is applicable to the case at bar, section 107 of chapter 41 of the Consolidated Laws was substituted in place thereof. Section 107 is as follows:

" Creditors' rights against sold goods in seller's possession. Where a person having sold goods continues in possession of the goods, or of negotiable documents of title to the goods and such retention of possession is fraudulent in fact or is deemed fraudulent under any rule of law, a creditor or creditors of the seller may treat the sale as void."

I think it is reasonable to presume that the rule of the common law which obtained in this State prior to the legislation contained in the Revised Statutes above referred to was designed to be restored in the enactment of the section just quoted. Under that rule retention of the possession of the goods was only presumptive evidence of fraud and the presumption was rebuttable by evidence showing the good faith of the transaction. Such evidence might be of such cogency as practically to annihilate the presumption and make the question of good faith one of law. Such has been declared to be the law. (*Prentiss Tool & Supply Company v. Schirmer*, 136 N. Y. 305, 311.) The evidence in the case

at bar is of that character so that I am of opinion that the only question that survives in this lawsuit, as the evidence now stands, is the question of the amount of the damages.

As the taking of the automobiles was wrongful, the nonsuit in favor of the defendant Arthur W. Haile was error.

I think that the plaintiff should have been permitted to show as part of *res gestæ* that Farley turned over to him the proceeds of the sales of the automobiles which the plaintiff had purchased and that it was error to exclude evidence to that effect.

It was also error to submit to the jury the question whether or not Farley was plaintiff's agent in buying the cars from the defendant corporation, as there was no evidence upon which it could have been claimed that Farley was an agent for that purpose.

At the request of the counsel for the defendants the learned trial court charged the jury that where personal property is sold and the physical possession thereof remains in the seller and no instrument is filed in any place where required, the sale is presumed to be fraudulent as against a *bona fide* purchaser and creditors under the law. An exception was taken to this ruling by the counsel for the plaintiff and I am of opinion that the learned trial court fell into error in complying with the request. The question was not in the case and quite likely had an effect upon the jury harmful to the plaintiff.

It follows from the foregoing that the judgment and order appealed from must be reversed and a new trial granted, with costs to the appellant to abide the event.

All concurred, except KRUSE, P. J., who dissented in a memorandum; LAMBERT, J., not sitting.

KRUSE, P. J. (dissenting):

I think the jury could find from the actual transaction, as disclosed by the written evidence and surrounding circumstances, that although the title was taken in the name of Farley, he held the title as agent for the plaintiff. The paper signed by Holley and Farley states that "I [referring to Holley] have bought for sale by Theo. J. Farley, as my agent," but does not state from whom he bought them. I

think the natural inference is that it refers to the sale from the motor company, from whom the automobiles had just previously been bought. Holley knew that the motor company was the general distributor to the selling agents of cars such as these were; he knew that Farley was the selling agent. The fact that the sale was to Farley, and not to Holley directly, is not inconsistent with the claim that Holley was to be the real owner. Holley was to furnish the means for purchasing the automobiles and upon the face of the note was the primary debtor, and Farley agreed to store the cars at his garage and sell them as soon as possible for the account of Holley.

I think the jury were warranted in finding that Farley was acting as Holley's agent in buying the cars from the motor company, or that he and Farley were partners, or at least jointly interested in the joint venture of buying and selling these cars, dividing the profits between them as detailed by Holley. The mere fact that this agency was not disclosed to the defendant motor company does not take the case out of the rule which binds a principal with knowledge of the facts involved in a given transaction within the scope of the agency.

But even if there was no such agency, the condition that the title to the automobiles should remain in the motor company until paid for was good as between Farley and the motor company, and also as to Holley, unless he was a purchaser in good faith. The burden of proof was upon him to show that he was such purchaser (*Cutler Mail Chute Co.* v. *Crawford,* 167 App. Div. 246, 253) and was, as I think, a question of fact and properly submitted to the jury.

Holley contends that he did not know of this condition, but he is an interested party and the jury could disregard the credibility of his testimony upon that point. I think they could find otherwise from the circumstances. As has already been stated, Holley knew these cars; he knew that Farley was such agent. It is not unreasonable to assume that he knew the manner of dealing between Holley and the motor company; he knew that Farley needed funds to pay for the cars, and it was known to everybody connected with these transactions that these cars were made to sell to customers by the selling agent. It is obvious that if the conditional bill of sale was

filed the cars could not be sold, which accounts for its not being filed.

While Farley produced a receipt acknowledging payment, the circumstances are such as to show that Holley knew they had not been paid for, because, as he himself testifies, he said to Farley: " If you are going to get these cars as fast as this I don't see any use in making out a note on each car.  *  *  * We might as well put the whole thing into one note." The jury need not find that Holley had notice. A finding that he had failed to establish that fact was enough to defeat him. He must establish that he was a purchaser in good faith.

If I am right so far it does not seem to me that the exceptions to the charge complained of require a reversal, nor does it seem to me that the court erred in excluding plaintiff's offer to show that Farley turned over to him the proceeds of the sale of the automobiles.

I, therefore, vote to affirm.

Judgment and order reversed and new trial granted, with costs to appellant to abide event.