**In re ENTERPRISE FOUNDRY CO.**
No. 8030.

District Court, E. D. Illinois.
April 2, 1941.

Baker, Lesemann, Kagy & Wagner, of East St. Louis, Ill., for trustee.

Ralph G. Crandall, of Chicago, Ill., for Montgomery Ward & Co.

WHAM, District Judge.

The evidence shows that in 1937 an agreement was entered into between Ward and the debtor whereby the debtor was to manufacture stoves for Ward and hold them pursuant to terms of said agreement pending orders from Ward for shipment to its various houses and customers. Said agreement was in full operation between Ward and the debtor up to and including September, 1940, and in a limited fashion thereafter.

By stipulation of the parties the procedure under which the said agreement was carried into effect was, in substance, as follows:

(a) Ward would send to the debtor paid stock orders for the manufacture of a specified number and kinds of stoves, with directions to segregate and to label and placard as property of Ward and to hold for shipping instructions. The orders would contain among other provisions the words, "Title shall pass at the time of segregation."

(b) Debtor would send Ward invoices listing number, kinds and prices of stoves manufactured, with statement thereon, "This merchandise has been placed in paid stock and placarded 'This is the property of Montgomery Ward and Company.'" The invoices would be accompanied by bills of sale providing that debtor was to retain possession in accordance with terms of said agreement and by non-negotiable warehouse receipts with affidavit by an official of debtor that such stoves had been labelled "Property of Montgomery Ward and Company" and segregated and set aside in the premises of debtor under signs clearly indicating "Property of Montgomery Ward and Company."

(c) Thereafter Ward would forward to debtor check covering the invoice or invoices.

(d) Ward from time to time would give debtor shipping instructions upon such stoves and upon fulfilment debtor would forward to Ward full report of the shipment with bill of lading attached.

(e) Ward would receive confirmation of the shipment from consignee.

(f) At the end of each month Ward would receive from debtor reports of all shipments made by debtor for Ward during the current month and statements of merchandise supposed to be in paid stock still held by debtor for Ward.

"Paid stock" as used in said agreement is defined and method of handling same is set forth in the agreement as follows:

"For your information, paid stock is merchandise which has been bought and paid for by our Company but which is allowed to remain in the custody of the vendor subject to our withdrawal. Withdrawals from paid stock will be requisitioned on a regular purchase order. These orders are in all cases to be filled by you from this paid stock until it is exhausted.

"All paid stock must be segregated from the vendor's merchandise under signs clearly stating 'Property of Montgomery Ward & Co.' Wherever the stock is stored in crates, boxes or cartons, each crate, box or carton should be labeled or stenciled 'Property of Montgomery Ward & Co.'"

Ward discovered in August, 1940, that there was some shortage in the paid stock retained by debtor and later was informed by the president of the debtor that the shortage was very much larger than Ward had supposed and that the debtor could not continue to fill orders and make up the shortage without additional capital.

On November 7, 1940, representatives of Ward went to debtor's plant in Belleville, Illinois, and the employees of the debtor pointed out two warehouses and told them that the Ward merchandise was in those warehouses. Ward made a rough inventory of the merchandise in the two warehouses which included both completed and

incompleted stoves. The stoves were in piles so that all could not be inspected but so far as could be determined without moving them all the stoves and parts of stoves were crated and bore marks and labels on both stoves and crates showing that they had been manufactured and crated for shipment for Ward. The marks and labels on the stoves and crates did not disclose that the merchandise was then owned by Ward or had been paid for or that the title thereto had been passed to Ward. Ward's men found signs lying about on the floors and in the corners of the warehouses which were, in substance, "Property of Montgomery Ward and Company." These signs they put up on or about the said merchandise.

Ward's representatives found the said warehouses unlocked and open on November 7 but a watchman was on the premises. On November 9 Ward's representatives boarded up the windows of the warehouses, placed locks on the doors and retained the keys. On the morning of November 12 they began loading the stoves on railroad cars for shipment but were notified at 11:30 A. M. on that day to stop and they did stop loading.

On November 12 the National Stock Yards National Bank obtained a judgment against debtor for $58,405.15 and an execution thereunder was placed in the hands of the sheriff at 7:30 P. M. on the same day which was immediately levied upon all the stoves in question. That evening an agreement was reached between Ward and said bank whereby Ward was permitted to take the stoves subject to a subsequent trial of rights of property.

On November 13 Ward resumed loading the completed stoves on cars for shipment and finished such loading on November 15 at 2:30 P. M. Within that time the stove parts which consisted of completed stove bodies but without warming closets or warming shelves which were necessary to make up the completed stoves were shipped by Ward by truck to another plant to be completed.

On November 15, 1940, a creditors' bankruptcy petition was filed against debtor and that proceeding was later succeeded by the corporate reorganization proceeding in which this matter is now pending. A receiver in bankruptcy was appointed on November 15 who notified the railroad carrier to stop the shipments of stoves which was done until they were released under an order of this court whereby the rights of all claimants to the stoves and stove parts were, by the consent of the parties, to be determined upon a hearing in this court. The trustee in the reorganization proceeding who succeeded to the rights of the receiver in bankruptcy claimed and secured the right under the Bankruptcy Act to preserve the lien, of the judgment of the National Stock Yards National Bank for the benefit of the debtor's estate.

There are certain additional facts that should be noticed: Ward's agreement with debtor was for the manufacture of completed stoves and all orders were for completed stoves. No uncompleted stoves were ever invoiced as such to Ward by debtor. Yet the evidence shows that there had been placed in the paid stock uncompleted stoves consisting of stove bodies without warming closets or warming shelves which were necessary to make up the completed stoves of a value of $9,996.90 which formed part of the merchandise taken by Ward. The evidence further shows that Ward paid for no invoices after October 3, 1940, but that completed stoves of a value of $3,325.50 were added to the paid stock during the month of October.

The provisions of the Uniform Sales Act, as enacted in Illinois, which need to be noticed, are Rules 1 and 2 of section 19 and section 26 of chapter 121½ of Illinois Revised Statutes 1939, which read as follows:

"Unless a different intention appears. the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer.

"Rule 1. Where there is an unconditional contract to sell specific goods, in a deliverable state, the property in the goods passes to the buyer when the contract is made, and it is immaterial whether the time of payment, or the time of delivery, or both, be postponed.

"Rule 2. Where there is a contract to sell specific goods and the seller is bound to do something to the goods, for the purpose of putting them into a deliverable state, the property does not pass until such thing be done."

Section 19, Rules 1 and 2.

"Where a person having sold goods continues in possession of the goods, or of negotiable documents of title to the goods,

and such retention of possession is fraudulent in fact or is deemed fraudulent under any rule of law, a creditor or creditors of the seller may treat the sale as void."

Section 26.

▌ Rule 1 of section 19 and section 26 have been dealt with in Doty v. O'Neill, 272 Ill.App. 212, where it is said that Rule 1 is a restatement of the rule at common law that title may pass between parties to a sale although possession is retained by the seller but the rule is not applicable when the rights of seller's creditors are involved and does not change the rule existing for many years in this State that if the seller remains in possession of the goods, the sale is fraudulent as to creditors of the seller without notice of the sale. With reference to section 26 the court said: "Construing section 26, the courts of the various States where the Uniform Sales Act is in force have followed the rule of their own State, that retention of possession of goods by the seller is deemed evidence of fraud upon creditors of the seller. This evidence is conclusive, or rebuttal, according to the pre-existing rule in the State where the question is decided. Shipler v. New Castle Paper Products Corp., 293 Pa. 412, 143 A. 182; Freedman v. Avery, 89 Conn. 439, 94 A. 969; Holley v. Haile Motor Co. [188 App.Div. 798], 177 N.Y.S. 429."

Section 26 is admitted by all parties to be applicable here. It presents two questions: First, was the retention of the stoves by the debtor fraudulent in fact? Second, was such retention fraudulent as to creditors under any rule of law?

▌ It does not appear in this case that the retention by debtor of the possession of the stoves which were sold to Ward did actually defraud anyone, except Ward, wherefore such retention was not fraudulent in fact.

Was such retention fraudulent under any rule of law? The rule of law mentioned must be found in the laws of Illinois. It is said in Williston on Sales, 2d Ed., § 351: "It seemed best to the Commissioners for Uniform State Laws, in considering this subject, not to attempt to make a uniform rule as to what constitutes fraud but to leave that matter to the law of each state."

From the beginning it has been the rule in Illinois that "A transfer of personal property, unaccompanied by a correspond-ing change of possession, is fraudulent per se, and void as to creditors." This rule was approved but distinguished in the early case of Thornton v. Davenport et al., 1 Scam. 296, 29 Am.Dec. 358, in which the Supreme Court of Illinois held that there was no fraud as to creditors where the owner of goods gave a deed in the nature of a mortgage to another conveying the title to such other to secure a sum of money which said deed provided that possession and use of the goods so conveyed should be retained by the vendor. In its opinion the court quotes with approval the English rule: " * * * all conveyances of goods and chattels, where the possession is permitted to remain with the alienor or vendor, is fraudulent per se, and void as to creditors and purchasers, unless the retaining of possession be consistent with the deed, as in case of an absolute unconditional sale, where the possession does not 'accompany and follow the deed.' "

It then states the Illinois rule: "Here the vendor's possession is not merely evidence of fraud, but, by legal inference, is a fraud per se, and cannot be rebutted by testimony of fair intention; because the possession not remaining with the person shown by the deed to be entitled to it, works deception and injury. But where from the nature and provisions of the conveyance, the possession is to remain with the vendor, and the transaction is bona fide, its so remaining is consistent with the deed, and does not avoid it."

Applying the stated Illinois rule to the case before them, the court said: "The conveyance from Wilhite was a mortgage, the legitimate object of which was to secure to a creditor a just debt; and it was expressly stipulated in the deed that Wilhite should retain possession of the mortgaged property, until the debt became due. Had not the deed contained this authority for his possession, there is no doubt but his retaining it would have constituted a legal fraud. Such too would have been the effect of his remaining in possession, if the deed to Thornton had been an absolute, in place of a conditional one, though authorized by its terms. In the first case his possession would not be authorized by the deed, and in the other, it would be inconsistent with its character, and therefore void. Neither of these objections, however, apply in this case. Wilhite's possession of the property is consistent with the object and intent of the deed, and is war-

ranted as well by its stipulations, as by its usual and legal operations; *for it is of the nature of a security that the debtor should retain possession until the day* of payment be past." (Italics mine.)

The principles embodied in the foregoing excerpts from Thornton v. Davenport, supra, remain the law of Illinois and have been applied in numerous subsequent cases of which the following are illustrative: Reed v. Eames, 19 Ill. 594; Thompson v. Yeck, 21 Ill. 73; Rozier v. Williams, 92 Ill. 187.

■ Ward insists that the retention of the possession of the stoves by debtor after their sale to Ward was consistent with the terms of the bills of sale and contracts between the parties which stipulated that such possession should be retained by the debtor, within the rule of Thornton v. Davenport, supra, and, therefore, cannot be deemed fraudulent under any rule of law. Such construction does violence to the principle relied upon. For the retention of possession of goods sold to another to be other than a legal fraud upon creditors such retention must be consistent not only with a stipulation in the instrument of transfer that possession be retained but it must be consistent with the legal character of the transaction, as, for example, where the conveyance is in the nature of security. Thornton v. Davenport, supra. Here there was an absolute sale and the stoves were conveyed to Ward by the debtor with the purpose that the absolute title and property therein should pass to Ward. Retention of possession was, therefore, inconsistent with the nature of the transaction and fraudulent unless such result was obviated by other provisions of the agreement and the actions of the parties thereunder. Rhines v. Phelps et al., 3 Gilman 455, 8 Ill. 455; Powers v. Green, 14 Ill. 386; Ticknor v. McClelland, 84 Ill. 471; Lemen v. Robinson, 59 Ill. 115.

The contracts and bills of sale provided further, however, that the debtor, in retaining possession of the stoves sold to Ward, should segregate them and mark them as the property of Ward. Ward claims that this was done by the debtor and thereby, though actual possession was retained by the debtor, creditors were put on notice that the stoves so segregated and marked were the property of Ward, thus rendering inapplicable the rule that retention of possession of goods by the seller after sale is fraudulent per se. Barker

& Sidwell v. Livingston County National Bank, 30 Ill.App. 591; Jacobson v. Patterson, 190 Ill.App. 266. Whether this might be true here under different evidence I do not decide. Under the evidence here the merchandise, though marked for shipment to Ward, was not completely segregated and plainly marked as the property of Ward. There was a commingling with the Ward paid stock of completed stoves that had been invoiced, sold to and paid for by Ward incompleted stoves title to which had not passed to Ward. This destroyed the legal effect of the purported segregation and of such marking of the merchandise as property of Ward as was shown by the evidence.

■ Ward further contends that it is entitled to the benefit of the principle that where the nature of property sold is such that immediate transfer of physical possession is impossible or impracticable only a symbolic delivery is required and a sale may be valid as against creditors even though the property remains after the sale upon the premises of the seller. Ticknor v. McClelland, supra; Hart v. Wing, 44 Ill. 141; May v. Tallman, 20 Ill. 443. I find as a matter of fact that the stoves were not of such bulky or cumbersome nature that it was impossible or impracticable to remove them as they were sold and paid for. Not more so than in Trimble v. Hunt, 169 Ill.App. 259, wherein a piano was held to be so easily movable that the principle did not apply. True, there was a large number of stoves in the warehouses but they might easily have been delivered as manufactured. Here, under the contract, possession might well be and doubtless often was retained by the seller for long periods of time, not because it was impossible or impracticable to remove the stoves but because it was convenient and economical not to remove them until Ward needed them.

■ Finally, Ward contends that regardless of whether the possession of stoves by the debtor was under the law a legal fraud upon creditors prior to November 9, 1940, it ceased to be so and the stoves became the property of Ward as against creditors of the debtor on that day when Ward's agents, with the consent of the debtor, placed locks upon the doors of the warehouses containing the stoves and retained the keys, thus taking symbolic delivery and possession of the stoves which they retained at the time of the levy of

the bank's execution. Feltenstein v. Stein, 157 Ill. 19, 45 N.E. 502; Kellogg Newspaper Company v. Peterson, 162 Ill. 158, 44 N.E. 411, 53 Am.St.Rep. 300. This contention must be upheld as to all the completed stoves in said warehouses that had been actually sold to and accepted and paid for by Ward prior to that time. Ward's possession of the contents of the warehouses at the time of the levy of the bank's execution being symbolic only was necessarily limited to the merchandise which had actually been sold to it of which there had been a completed sale and not to such other merchandise as happened to be in the warehouses.

■ It seems quite apparent from the circumstances shown by the evidence that the fact that the incompleted stoves had previously been placed among the Ward paid stock cannot be interpreted to mean that the debtor intended to or did pass title thereto to Ward. It is a fair inference from the evidence that the incompleted stoves were placed in the warehouses containing the so called paid stock as a matter of convenience to the debtor. The evidence shows that the stove bodies and the stove tops both of which were necessary to complete the stoves were each manufactured without regard to the time of the completion of the other and had to be assembled as of the time when both the stove body and the stove top (which consisted of a warming shelf or warming closet, as the case might be) were available. It is a fair inference, too, that such assemblage was completed in the warehouses. Debtor had no contract with Ward to supply stove bodies without warming closets or warming shelves which were required to complete them. Debtor could not, under the contract, invoice incompleted stoves to Ward or properly give a bill of sale or warehouse receipt therefor. It would seem that the title to such incompleted stoves did not pass to Ward. Rule 2 of section 19, chapter 121½, Illinois Revised Statutes, 1939; Rothwell v. Luken, 60 Ill.App. 150; Schneider v. Westerman, 25 Ill. 514; Clarkson v. Stevens, 106 U.S. 505, 1 S.Ct. 200, 27 L.Ed. 139; 24 R.C.L. 31. The symbolic delivery of the contents of the two warehouses to Ward at Belleville on November 9, 1940, and the days that followed gave Ward no right to the incompleted stoves, or stove bodies without tops, as against the other creditors. The lien of the bank under its levy attached and must prevail as to the incompleted stoves in controversy.

■ The completed stoves found by Ward in the warehouses which had been manufactured for Ward and placed in the paid stock during the month of October, 1940, as shown by Ward's Exhibit 11 were never paid for and the title had not passed to Ward at the time its representatives took symbolic delivery of the stoves on November 9, 1940. Whether or not invoices or bills of sale and warehouse receipts had gone forward to the debtor from Ward covering the October additions to the paid stock, it does appear that they had not been accepted by Ward. The evidence shows that Ward had decided late in September or early in October not to pay for any more stoves upon paid stock invoices unless and until some more satisfactory arrangement could be made to assure that the stoves covered were actually in the paid stock. It was too late to decide to accept them after Ward came to Belleville and found the true condition of the debtor, and apply them on past indebtedness. That large numbers of other stoves had been paid for by Ward which had never been received gave Ward no right, as against creditors, to seize these stoves for which it had not paid. These stoves it must share with the other creditors who have likewise suffered losses through the perfidy of the debtor.

My conclusion is that of the stoves and parts of stoves taken by Ward from the debtor's plant in November, 1940, Ward must pay to the trustee the value of the incompleted stoves, as shown by Ward's Exhibit 12 to be of a value of $9,996.90 and the value of the stoves that were added to the paid stock in October which I find to have been of a value of $3,325.50. Ward should also pay for the two completed stoves taken which are not claimed by Ward and were stipulated to be of a value of $43.25. Ward is entitled to retain all of the other completed stoves taken, which were of a value of $22,866.70.

Counsel for Ward may prepare and submit to counsel for trustee proposed findings, conclusions and order in accord with this memorandum, and if such cannot be agreed upon, they may be filed with the court and trustee may file objections and suggestions. Each party to pay its own costs and witness fees.