Procter & Gamble Company, Respondent, *v.* Peters, White & Company, Appellant.

Sale — passing of title — what separation or appropriation necessary — oil placed in storage tank as part of process of manufacture does not pass to purchaser without some further setting apart or appropriation thereof — title passes upon loading of oil in cars furnished by purchaser — diversion of such cars and delivery to another customer a conversion — oil loaded into cars not furnished by purchaser not converted by shipment to another — setoff.

1. Where oil is placed in a storage tank as part of the process of manufacture to await appropriation and delivery on contracts or to customers, there must be some act upon the part of the seller setting apart and appropriating the oil to the purchaser, before title passes.

2. Where plaintiff, which had contracted with a manufacturer of

oil to take all of its product except a specified amount, sent two of its tank cars to the seller's plant, where they were loaded with oil from a storage tank, there was an appropriation and delivery within the terms of the contract and a factor of the seller who diverted said cars and sent them to another customer is liable for conversion.

3. But where oil is loaded into cars not furnished by plaintiff, from a tank into which it had gone as part of the process of manufacture, and there is no evidence of an appropriation of the oil to the plaintiff, it cannot recover for conversion because the cars were shipped to another. A provision in the agreement that in case of the plaintiff's failure to have tank cars or barrels at the seller's plant the seller should store the said oil in his own tanks at the factory, did not contemplate a setting apart and separation of the manufactured oil for the plaintiff where the oil would have gone into the storage tank whether intended for the plaintiff or any other purchaser or any number of purchasers.

4. The defendant being liable to plaintiff for the conversion of two carloads of oil it cannot offset against its liability a claim on its part against the seller on the theory that the plaintiff is indebted to the seller for the oil. By its own wrong in converting the oil already delivered to the plaintiff it cannot recover part of its claim against the seller.

*Procter & Gamble Co.* v. *Peters, White & Co.*, 194 App. Div. 892, reversed.

(Argued January 31, 1922; decided February 28, 1922.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered November 10, 1920, affirming a judgment in favor of plaintiff entered upon a verdict directed by the court.

*E. H. Sykes* for appellant. Title to the oil did not pass upon its production. Further acts of appropriation with the assent of both seller and purchaser were necessary to pass title to the respondent and these acts of appropriation are lacking. (*Low* v. *Pew*, 108 Mass. 347; *Andrews* v. *Durant*, 11 N. Y. 35; *N. J. R. R. Co.* v. *Trenton C. W. Co.*, 32 N. J. L. 517; *Hart* v. *Taylor*, 82 N. Y. 376; *Deeley* v. *Dwight*, 132 N. Y. 59; *A. B. Supply*

*Co.* v. *V. P. Cement Co.*, 203 N. Y. 133; *Comfort* v. *Kiersted*, 26 Barb. 472; *Andrews* v. *Newcomb*, 32 N. Y. 417; *Rochester Distilling Co.* v. *Rasey*, 142 N. Y. 570.) Title to the oil did not pass upon production nor subsequent thereto because the oil to which the plaintiff was entitled was not identified. (*Lighthouse* v. *Third Nat. Bank*, 162 N. Y. 336.)   Damages were excessive under any circumstances to the extent of the interest of the Atlantic Phosphate and Oil Company and the defendant as its agent and transferee in the oil alleged to have been converted, that is, twelve and one-half cents on each gallon, with interest.   (*Fowler* v. *Haynes*, 91 N. Y. 352; *Smith* v. *Savin*, 141 N. Y. 329; *Davis* v. *Miller's Auction Rooms*, 144 N. Y. Supp. 673; *Lewis* v. *Mott*, 36 N. Y. 400; *First Nat. Bank of Louisville* v. *Boyce*, 78 Ky. 42; *Talty* v. *Freedman's Savings & Trust Co.*, 93 U. S. 321.)

*Eugene Lamb Richards* and *Rutherford B. Meyer* for respondent.   The intention of the parties is the controlling factor in the interpretation of the contract. (Personal Property Law, §§ 86, 100; *Burrows* v. *Whitaker*, 71 N. Y. 296; *Cornell* v. *Clark*, 104 N. Y. 451; *Groves* v. *Warren*, 226 N. Y. 459; *Flannery* v. *Van Tassel*, 131 N. Y. 639; *Newgass* v. *Auburn L. Co.*, 81 App. Div. 413.) The title to the oil passed upon production and was fully identified.   (*Curtis* v. *Natalie A. C. Co.*, 89 App. Div. 61; 181 N. Y. 543.)   Damages for the full value of the oil were properly awarded.   (*Madison Sq. Bank* v. *Pierce*, 137 N. Y. 444; *Einstein* v. *Dunn*, 61 App. Div. 195; *Rogers* v. *A. G. & P. Co.*, 213 N. Y. 258, 259; *Squire* v. *Ordeman*, 194 N. Y. 399; *Toplitz* v. *Bauer*, 161 N. Y. 332.)

CRANE, J.   On the 29th day of January, 1914, the Atlantic Phosphate and Oil Corporation, a New York company, entered into a contract with the plaintiff in this case, the Procter & Gamble Company of Ohio, wherein the Atlantic Phosphate and Oil Corporation agreed to

sell to the plaintiff all the menhaden oil, grade " A " to be produced by the seller at its plant at Promised Land, Long Island, New York, during the period from the date of the contract to December 31st, 1914. The contract contained the following provision:

" The Purchaser shall receive the oil in Purchaser's tank cars, to be supplied by the Purchaser at the Seller's said factory at Promised Land, or at the Purchaser's option, from time to time, in Purchaser's barrels, to be furnished by the Purchaser at the said factory at Promised Land. * * * The Purchaser shall provide enough tanks or barrels at the factory as aforesaid to take and receive all said oil as and when produced by the Seller, except as hereinafter provided. * * * If at any time there shall not be at the factory sufficient tank cars or barrels furnished by the Purchaser to receive all the oil as fast as produced, the Seller shall store the said oil in its own tanks at its factory, and Marden, Orth & Hastings Company shall invoice the oil so soon as stored in said tanks to the Purchaser, and shall be entitled to draw on the Purchaser at sight, at the same rate of 25 cents a gallon for the said oil so stored in storage tanks, as well as for the oil placed in said tank cars or barrels; provided, however, that if at any time the oil so stored in the Seller's storage tanks shall reach the amount of fifteen thousand barrels, and there shall not be enough tank cars or barrels provided by the Purchaser to take care of all excess as fast as produced, the Seller may ship such excess oil to the Purchaser or store the same in any way that may be possible, and the Purchaser in that event shall pay to the seller any extra expenses thus incurred by the Seller."

The contract further provides for an advanced payment of $25,000 by the purchaser and the terms of subsequent payments which need not here be referred to.

Although the purchaser was to take all the menhaden oil manufactured by the seller during the period specified,

there was excepted from this amount 6,000 barrels or such part thereof as Marden, Orth & Hastings Company might take under an agreement between it and the Atlantic Phosphate and Oil Corporation, dated the 15th day of October, 1913.

Marden, Orth & Hastings Company, by an agreement of said date, appeared to have been appointed the factors or agents of the Atlantic Phosphate and Oil Corporation and to have procured the Procter & Gamble Company contract above referred to.

By another contract, dated May 1st, 1913, the defendant in this case, Peters, White & Company, a New York corporation, was appointed factor for the Atlantic Phosphate and Oil Corporation, and given the exclusive right and authority to make agreements for the sale of the oil product, to invoice for the same, and make all collections.

During August and September of 1914 seven carloads of this oil were taken from the storage tank of the Atlantic Phosphate and Oil Corporation and shipped to Swift & Company of Chicago, Illinois, pursuant to the directions of the defendant. For six of the carloads the defendant was paid by Swift & Company. Two of the tank cars thus loaded and shipped had been sent to the seller's plant at Promised Land by the plaintiff. The order for the bill of lading for these two cars was drawn to the order of Peters, White & Company, with instructions to notify Swift & Company, the destination being Union Stock Yards, Chicago, state of Illinois. The other five cars were not furnished by the plaintiff and were consigned by orders for bill of lading in the same way to the order of Peters, White & Company with directions to notify Swift & Company at the Union Stock Yards, Chicago, Illinois.

There is no question about the direction and control of the defendant over this oil and the shipments made by the Atlantic Phosphate and Oil Corporation.

This action has been brought by the plaintiff against

the defendant, the factor, to recover for a conversion of this oil, the plaintiff contending that having purchased all the oil to be manufactured by the Atlantic Phosphate and Oil Corporation, title had passed to it when the oil entered the storage tanks and that the subsequent shipment and delivery by the defendant to Swift & Company amounted to a conversion of the oil. The plaintiff thus far has been successful in this contention and has recovered the full value of the seven cars thus' shipped to Swift & Company. The opinion of the Appellate Division on a previous trial of this case will be found in 187 Appellate Division, 376. The point in the case is the question whether or not title was in the plaintiff, whether there had been such an appropriation of this oil to the contract by the Atlantic Phosphate and Oil Corporation as to pass title.

As the passage of title depends in each case upon the circumstances and the intention of the parties (*Hatch* v. *Oil Co.*, 100 U. S. 124) we must first ascertain the exact facts and from these gather the intention of the parties, aided by our Personal Property Law. The oil which the plaintiffs purchased was made from fish by a process described as follows: " The oil, after it was pressed from the fish, after the cooking process, the oil came out cloudy and more or less solid matter mixed through it. It had to be cooked after the pressing and permitted to stand for several days before it was clean and in condition to ship. There are a number of tanks in Promised Land, cooking tanks, in which the preliminary cooking takes place and settling tanks in which solid matter is permitted to settle out, and then storage tanks in which the oil is stored after it is settled. * * * The oil that was accumulated after settling in the storage tanks was drawn' from the storage tanks into tank cars and the tank cars were weighed by the railroads and shipped to destination."

The oil, therefore, went into the storage tank as part

of the process of manufacture in any and at all events. When the agreement made with Procter & Gamble Company provided, as above quoted, that in case of the plaintiff's failure to have the tank cars or barrels at the seller's plant at Promised Land the seller should store the said oil in his own tanks at the factory, it did not contemplate a setting apart and separation of the manufactured oil for the plaintiff. The oil would have gone into the storage tank whether intended for the plaintiff or any other purchaser or any number of purchasers. It was the place for keeping it after manufacture, in the same way that a bin may be a receptacle for keeping grain or a warehouse for storing merchandise. There was nothing in the nature of the act in sending the oil into the storage tank which indicated in itself that it was set apart for the plaintiff. Marden, Orth & Hastings Company had an option mentioned in the plaintiff's contract to take 6,000 barrels of this oil. They did not exercise the option and it was testified upon the trial that they consented that the plaintiff should have all the oil contracted for. There is, however, no evidence that this so-called waiver or consent was definitely or specifically communicated to the seller. If, therefore, Marden, Orth & Hastings Company had exercised the option, the 6,000 barrels or the portion thereof taken, would have run into the storage tank in the process of manufacture, together with the oil intended for, and to be delivered to, the plaintiff.

Our Personal Property Law (Cons. Laws, ch. 41) deals with the question of purchase and sale of goods to be manufactured as follows:

" Section 86. Existing and future goods. 1. The goods which form the subject of a contract to sell may be either existing goods, owned or possessed by the seller, or goods to be manufactured or acquired by the seller after the making of the contract to sell, in this article called ' future goods.'    *    *    *

" 3. Where the parties purport to effect a present sale of future goods, the agreement operates as a contract to sell the goods."

Section 156, subdivision 4, reads: " 4. Goods are in a ' deliverable state ' within the meaning of this article when they are in such a state that the buyer would, under the contract, be bound to take delivery of them."

Section 100 gives the rules for ascertaining intention. " Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer.    Rule 4.  1.  Where there is a contract to sell unascertained or future goods by description, and goods of that description and in a deliverable state are unconditionally appropriated to the contract, either by the seller with the assent of the buyer, or by the buyer with the assent of the seller, the property in the goods thereupon passes to the buyer.  Such assent may be expressed or implied, and may be given either before or after the appropriation is made."

It may be that upon the completion of manufactured goods, ready for delivery, title will pass to the purchaser by the intention of the parties, without any further act. In other words, that intention alone may pass title without delivery, setting apart, or appropriation of the article to or for the purchaser.    (*Clarkson* v. *Stevens*, 106 U. S. 505.)

In this case, however, we think it is in harmony with the contract, with our statute, and with the decisions, to hold that there must have been some act upon the part of the seller setting apart and appropriating the oil to the purchaser before title passed.    (*Haynes* v. *Quay*, 134 Mich. 229.)

When in the process of manufacture the oil passed into the storage tanks there must have been " a subsequent appropriation " to the plaintiff's contract (*Cooke* v. *Millard*, 65 N. Y. 352, 366), or after the oil was in a deliverable state, it must have been " unconditionally

appropriated to the contract" (Rule 4, *supra*) before the plaintiff in this case took title to the oil. (Williston on Sales, § 274; *Cooke* v. *Millard, supra; Andrews* v. *Durant,* 11 N. Y. 35; *Aldridge* v. *Johnson,* 7 E. & B. 885; *Low* v. *Pew,* 108 Mass. 347; *Mucklow* v. *Mangles,* 1 Taunt. 318.)

We cannot find in this case any evidence of this appropriation or setting apart of the oil for the purpose of the purchaser's contract, with the exception of two carloads. As to the two cars belonging to the plaintiff into which the oil was put there can be no question in my mind but that the oil was not only appropriated and set apart to the contract, but that there was an actual delivery of the oil to the plaintiff as specified in the contract. (*Langton* v. *Higgins,* 4 H. & N. 402.) The plaintiff had sent its tank cars to the seller's plant at Promised Land. These were loaded with the oil from the storage tank, and in one instance the bill of lading was made out to the defendant as consignee with directions to notify the Procter & Gamble Company. This bill of lading was subsequently changed by striking out the plaintiff's name and substituting Swift & Company. By putting the oil into the plaintiff's cars there was an appropriation and delivery within the terms of the contract, and the defendant is liable for conversion in sending this oil to Swift & Company.

As to the other five cars there was no appropriation of the oil so far as we can discover from the evidence. It went into the storage tank as part of the process of manufacture to await appropriation and delivery on contracts or to customers. It was shipped to Swift & Company, and in our judgment never became the property of the plaintiff. In so far as the plaintiff has recovered for the conversion of this oil by the defendant, there must be a reversal or a modification of the judgments below.

There is a remaining point which must be considered, and that is the right of the plaintiff to recover the full

value of the two cars converted. By its contract with the Atlantic Phosphate and Oil Corporation it had advanced $25,000 before receiving any oil. It was agreed regarding future delivery and payments as follows: " If the said note for $25,000 shall be outstanding and unpaid in whole or in part on June 30th, 1914, the Purchaser may, at its option, demand that one-half of each draft drawn upon the Purchaser, as hereinbefore provided, at twenty-five cents a gallon for oil produced after June 30th, 1914, shall be credited upon the said draft as paid, and the amounts so credited as paid by the Purchaser on the said drafts shall also be credited upon the said note of the Seller held by the Purchaser as being payments of the same amounts at the same dates respectively, until the said note for Twenty-five thousand Dollars ($25,000) · and interest thereon, has been fully paid; provided, however, that the amounts credited to the Purchaser as paid on the said drafts for shipments made in any one calendar month after June 30th, 1914, shall not exceed the aggregate of Ten thousand Dollars ($10,000); and provided, however, that it is agreed that final payment of the said note of the Seller for Twenty-five thousand Dollars ($25,000) and interest thereon, shall be made by the Seller in full not later than October 1st, 1914."

In other words, had the plaintiff received these two converted carloads, it would have been obliged to pay to the seller twelve and one-half cents a gallon, although the seller owed it much more money on the note of $25,000. The defendant, in this case, the factor and agent, claims that as the Atlantic Phosphate and Oil Corporation owed it money, it stands in the place of that company and is entitled to a deduction of twelve and one-half cents a gallon upon the value of these two carloads converted.

We do not think that the defendant in this case is in a position to recover from the plaintiff money due to it from the Atlantic Phosphate and Oil Corporation. By

its own wrong in converting the oil already delivered to the plaintiff it cannot recover part of its claim against the seller.

The account between the plaintiff purchaser and its seller, the Atlantic Phosphate and Oil Corporation, may be adjusted between them at the proper time and place, but this is not a case where the agent or factor, by its own wrong, can take advantage of a privilege or option given by a contract between its principal and a third party.

For the reasons here stated, the judgments appealed from must be reversed and a new trial granted, costs to abide the event.

HISCOCK, Ch. J., HOGAN, CARDOZO, POUND, Mc-LAUGHLIN and ANDREWS, JJ., concur.

Judgments reversed, etc.