STATE OF TENNESSEE ON RELATION OF DAY PULVERIZER COM-
PANY, COMPLAINANT, APPELLANT, *v.* W. J. FITTS, COM-
MISSIONER OF AGRICULTURE OF THE STATE OF TEN-
NESSEE *et al.,* DEFENDANTS, APPELLEES.

(*Nashville,* December Term, 1932.)

Opinion filed May 20, 1933.

Cornelius & McKinney, for complainant, appellant.

Roy H. Beeler, Attorney-General, and Edwin F. Hunt, Assistant Attorney-General, for defendants, appellees.

Special Justice W. B. Garvin delivered the opinion of the Court.

This is a bill for mandamus by the Day Pulverizer Company as relator against W. J. Fitts as Commissioner of Agriculture, Charles M. McCabe as Commissioner of Finance and Taxation, and Roy C. Wallace, Comptroller of the Treasury, to compel them in their respective official capacities to voucher, approve and issue to the relator a warrant upon the State treasury for $7195, the price of six limestone pulverizers which the relator sold to the State for the use of the Department of Agriculture, and which the Department of Agriculture has refused to take and pay for.

In the general appropriation bill passed by the General Assembly of 1931 was included an appropriation of $25,000, or $12,500 per annum, ''for the purchase and operation of lime pulverizing machines to furnish agricultural limestone for demonstrational purposes to the farmers of Tennessee,'' and it was directed ''that the administration of said (above) lime program be under the direction of the Commissioner of Agriculture.'' Upon the passage of the bill containing this appropriation, L. W. Brooks, vice president and treasurer of the Day Pulverizer Company, who had been somewhat active in procuring the appropriation to be made, approached the defendant Fitts with the view of selling him limestone pulverizers manufactured by the relator. As the result of one or more interviews between them Dr. Fitts issued and gave to Brooks a requisition on the State Purchasing Agent A. L. LaBar for three such machines. Brooks carried the requisition to LaBar and received from him an order for three No. 2 Model E. Day Limestone Pulverizers at the price of $3795. This order, omitting some immaterial words and figures, read as follows:

"STATE PURCHASING DEPARTMENT
Nashville, Tenn.

All Transportation Charges Order No. 178
Must be fully Prepaid. Re. No. 155

7/9/31

To Day Pulverizer Co.,
ADDRESS Knoxville, Tenn.
SHIP AND At Nashville, Tenn.
BILL TO
Dept. of Agriculture, F. O. B. Knoxville, Tenn.
Div. of Administration

| Quantity | Description of Goods Ordered | Price | Per | Amount |
|---|---|---|---|---|
| 3 | No. 2 Model "E" Day Patent Limestone Pulverizer mounted on truck, complete with all steel elevator and automatic self registering weigher. | 3,795.00 | lot | |
| | Less $\frac{1}{2}$ of 1%—10th prox. | | | |

ATTENTION
Send quadruplicate invoice to PURCHASING AGENT
Institution receiving goods
with Purchase Order No. as above A. L. LaBAR
when Shipped. Send one copy of
invoice to State Purchasing Dept. By F"
Prompt shipment must be made.

About a week later Brooks obtained from Dr. Fitts a requisition for three additional machines, on which the State Purchasing Agent gave him an order. This order was in form a duplicate of the order above set out, except that it was dated July 24, 1931, was numbered 191 and stated the price of the three additional machines to be $3400.

It is the insistence of Dr. Fitts in his deposition in the cause and of all of the defendants in their answer that he was induced to make the requisitions aforesaid by the representations of said Brooks as to the qualities and capacity of the No. 2 Model E Day pulverizer and by his representation that the price charged the State of Tennessee therefor was not more than the price charged by the relator to the State of Kentucky for the same machine.

The relator acknowledged acceptance of the two orders in letters addressed to Dr. Fitts under date of July 13 and July 27, respectively. The letter of July 13 reads as follows:

"We appreciate very much the valued order #178 for three DAY Patent Limestone Pulverizers mounted on trucks with elevators and automatic self-registering weighers.

"Order for these machines were immediately placed with our shop foreman and delivery will be made immediately upon receipt of shipping instructions.

"Again thanking you very kindly for past favors and trusting that we may receive shipping instructions at an early date, we are

Cordially yours"

The letter of July 27 reads as follows:

"Gentlemen: Attention Dr. W. J. Fitts, Please. We appreciate your order #191 covering three No. 2, Model "E" DAY Patent Limestone Pulverizers, mounted on All-steel Trucks, with Elevators and Automatic Self-registering Weighers.

"The above order is ready for delivery and prompt shipment will be made upon receipt of shipping instructions.

Cordially yours"

Also, the relator under date of July 14 sent the Department of Agriculture an invoice of the first three machines, and under date of July 27 an invoice of the second three machines.

Subsequently Dr. Fitts received information that the No. 2 Day pulverizer was too heavy for the kind of work his department intended to use it for, and that another make of machine called the Tarvin was preferable; also that the relator had sold the Department of Agriculture of the State of Kentucky its No. 2 machine for $920 net, and its No. 101 machine at $612 net. On August 1st Dr. Fitts wrote Brooks a letter in which, after mentioning these matters, he impliedly, though not expressly, cancelled the orders for the No. 2 machine and expressed a willingness to confirm the purchase of three No. 101 machines on the same basis they were sold to Kentucky.

On August 3, the State Purchasing Agent by the direction of Dr. Fitts sent the relator cancellations of the two orders.

Thereafter there were various negotiations between the parties in the course of which Dr. Fitts purchased outright for his department one No. 2 Day pulverizer and one No. 101 Day pulverizer, and tests were made of the Day machine and the Tarvin machine. It is the insistence of the defendants that by the purchase of the last two machines (which were retained by the Department and have been fully paid for) the claims of the relator in regard to the first six machines were compromised and settled. This is denied by the relator, and, the defendants persisting in their refusal to recognize the right of relator to payment, this bill was filed.

The Chancellor dismissed the bill, upon the ground, as stated in his decree, that the contracts for the sale of

the six machines were procured by the fraudulent misrepresentations of Brooks as the agent of relator and were cancelled by the defendant Fitts for that reason, and the ground that after said cancellation all claims asserted by the relator for the purchase price of said (six) pulverizers were adjusted and settled by the parties.

The evidence relating to the facts upon which the Chancellor based his decree is conflicting and, while we do not wish to be understood as disagreeing with him in his conclusions thereon, we think a discussion of that evidence is unnecessary because in our opinion his decree was correct upon a ground not referred to by him and about which there is no conflict in the evidence. To grant the relator the relief it seeks would be in contravention of Section 8634 of the Code of 1932 (Section 4507 of Shannon's Code) which reads as follows:

"No court in the state shall have any power, jurisdiction, or authority to entertain any suit against the state, or against any officer of the state acting by authority of the state, with a view to reach the state, its treasury, funds, or property, and all such suits shall be dismissed as to the state or such officers, on motion, plea, or demurrer of the law officer of the state, or counsel employed for the state."

This was one of the defenses set up in the answer.

An action cannot be maintained against the State directly, or indirectly against it through its officials, for the breach of an authorized but merely executory contract entered into by them for or on its behalf. Recognizing the correctness of this proposition, counsel for the complainant insist that these contracts, though executory in the beginning, had become executed contracts in that the title to the six machines had passed to the State

before the attempted cancellation of the orders, and that mandamus lies to compel the defendants to perform the merely ministerial acts of paying for them. We do not think the title had passed.

The machines in question were one of several sizes of pulverizing machines which the relator was in the business of manufacturing and selling at Knoxville in this State. It did not, however, actually make all the parts. The metal castings which went into and formed the larger part of the machines, the relator purchased from other concerns. Its work of manufacture consisted of grinding the casting and assembling the different parts into a machine. With the castings on hand, it was able to thus manufacture about five machines in a day. At the date at which the first order for three No. 2 pulverizers was given, the relator did not have any of the machines in stock unless, perhaps one. The sale was made from a printed list in the hands of Brooks, in which the different sizes and numbers of the Day machines manufactured by the relator were set out and the prices stated and a pamphlet in which the specifications and capacities of the several sizes were set forth and the merits of relator's line of machines extolled. The statement that the machines in question were manufactured for the defendant's orders means only that they were manufactured because of the orders and for the purpose of filling the same, not that there was anything special or different about them.

The Uniform Sales Law is incorporated in the Code of 1932 in sections 7191 et seq., Section 7210 provides:

"Where there is a contract to sell unascertained goods, no property in the goods is transferred to the buyer unless and until the goods are ascertained" . . .

Section 7212 provides as follows:

"Unless a different intention appears, the following are rules for ascertaining the intention of the parties as to the time at which the property in the goods is to pass to the buyer."

. . . . . .

"Rule 4. (1) Where there is a contract to sell unascertained or future goods by description, and goods of that description and in a deliverable state are unconditionally appropriated to the contract, either by the seller with the assent of the buyer, or by the buyer with the assent of the seller, the property in the goods thereupon passes to the buyer.

"Such assent may be expressed or implied, and may be given either before or after the appropriation is made.

"(2) Where, in pursuance of a contract to sell, the seller delivers the goods to the buyer, or to a carrier or other bailee (whether named by the buyer or not) for the purpose of transmission to or holding for the buyer, he is presumed to have unconditionally appropriated the goods to the contract, except in the cases provided for in the next rule, and in section 7213. This presumption is applicable, although by the terms of the contract the buyer is to pay the price before receiving delivery of the goods, and the goods are marked with the words "collect on delivery" or their equivalents.

"Rule 5. If the contract to sell requires the seller to deliver the goods to the buyer, or at a particular place, or to pay the freight or cost of transportation to the buyer, or to a particular place, the property does not pass until the goods have been delivered to the buyer or reached the place agreed upon."

Now, while it is undoubtedly true that the relator

manufactured these machines for the purpose of filling the State's order, there is nothing to show that it did any act to mark them or set them aside as the State's property or as intended to fill its orders. In the case of *Wills* v. *Investor's Bankstock Corp.*, 257 N. Y., 451, S. C., 78, A. L. R., 1013, it was said:

"It has been said that probably the rule that property in goods passes by mere appropriation on the part of the seller with the assent of the buyer "has been reached by an extension of the doctrine of delivery." 1 Williston on Sales (2 Ed.), 274, note 14. In order to pass property in unascertained or future goods, "appropriation" even with the assent of the buyer, must be more than a "selection on the part of the vendor, where he has the right to choose the article which he has to supply in performance of his contract." *Wait* v. *Baker*, 2 Exch. 1; *Proctor & Gamble Co.* v. *Peters, White & Co.*, 233 N. Y., 97, 134 N. E., 849. Something must be done, or, at least, something must happen, which by assent of both parties shall carry out their intention that at that point property shall actually pass to the buyer. Then where the seller still retains possession, he "by operation of law becomes bailee of the goods." 1 Williston on Sales, Sec. 274, note 14," and in the case of *Proctor & Gamble Co.* v. *Peters, White & Co.*, 233 N. Y., 97, it was said:

"It may be that upon the completion of manufactured goods, ready for delivery, title will pass to the purchaser by the intention of the parties, without any further act. In other words, that intention alone may pass title without delivery, setting apart, or appropriation of the article to or for the purchaser. (*Clarkson* v. *Stevens*, 106 U. S., 505.)

"In this case, however, we think it is in harmony with

the contract, with our statute, and with the decisions, to hold that there must have been some act upon the part of the seller setting apart and appropriating the oil to the purchaser before title passed. (*Haynes* v. *Quay*, 134 Mich., 229.)

The invoices which relator sent cannot be considered as an appropriation of these particular machines to the State's contracts, but if they could be so considered, Dr. Fitts did not give any express assent thereto, nor do we think that his assent is to be implied from his delay in writing his letter of August 1.

But Rule 4 above quoted is only applicable "unless a different intention appears." In this instance we think a different intention does appear. By the terms of the contracts the machines were to be *shipped* by the relator. This necessarily implies that they were to be delivered by the relator to a carrier. Furthermore, they were to be shipped *f.o.b.* Knoxville. This means that they were to be put into the hands of a carrier by the relator free of expense to the State. On the question of when the title passes under f.o.b. contract, Williston in his work on Sales, Section 280b says:

"Sec. 280b. When the property passes under F.O.B. Contracts.

"As it is a necessary implication in F.O.B. contracts that the buyer is to be at all expense in regard to the goods after the time when they are delivered free on board, the presumption follows that the property passes to the buyer at that time, and not before, though the goods are brought to the point of shipment and are ready for loading; and the further presumption follows that the place where the goods are to be delivered F.O.B. is the place of delivery to the buyer. The general rule, how-

ever, must be qualified by two possibilities; the first relating to the form of the bill of lading and the second to the other terms of the contract.''

In the instant case there were no other terms of the contract and no shipment. The foregoing statement of the law by Williston is supported by the authorities which he cites, and by many later decisions.

 It may be proper to mention in conclusion the rule, adopted in New York and many other states and approved in our State in the case of *Mayberry* v. *Lilly Mill Company*, 112 Tenn., 564, prior to the adoption of the Uniform Sales Law, that where a vendee refuses to complete an executory contract of sale by accepting delivery and paying for the goods, the vendor may at his election treat the goods as the property of the vendee and sue him for the contract price. This rule was changed by the Uniform Sales Law, except in the cases provided for in Section 7256, subsection 3. It never was applicable in a case where the State was the real defendant, its virtual effect being to permit enforcement of specific performance against the vendee.

The decree of the Chancellor is affirmed.